The MOZART COMPANY, a corporation, Plaintiff–Appellant,

v.

MERCEDES–BENZ OF NORTH AMERICA, INC., a corporation, Defendant–Appellee.

Nos. 86–1733, 86–2156.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 13, 1987.

Decided Dec. 9, 1987.

Moses Lasky, Lasky, Haas, Cohler & Munter, San Francisco, Cal., for plaintiff-appellant.

George A. Cumming, Jr., Brobeck, Phleger & Harrison, San Francisco, Cal., for defendant-appellee.

Before SNEED, ALARCON and CANBY, Circuit Judges.

SNEED, Circuit Judge:

Mozart Co. (Mozart), an auto parts distributor and manufacturer, alleged various antitrust violations by Mercedes–Benz of North America, Inc. (MBNA), arising out of MBNA's franchise agreements with its dealerships. The agreements required each franchisee to deal exclusively in replacement parts supplied by MBNA. Following an eleven-week jury trial, the jury rendered a special verdict, finding that, although MBNA had violated the Sherman Act by way of a tying arrangement, there was a business justification for the conduct. The district court entered judgment for MBNA without submitting Mozart's other claims to the jury. Mozart appeals the district court's judgment that it take nothing, and also appeals the court's award of costs to MBNA. We affirm.

I.

FACTS AND PROCEEDINGS BELOW

Defendant-appellee MBNA has been the exclusive United States distributor of Mercedes–Benz automobiles since 1965. MBNA is a wholly-owned subsidiary of Daimler–Benz Aktiengesellschaft (DBAG), the German manufacturer of Mercedes automobiles and their replacement parts. Daimler–Benz of North America, Inc. (DBNA) is the exclusive United States importer of DBAG products.

MBNA markets its passenger cars and genuine and approved replacement parts through approximately 400 franchised dealerships. Each dealer becomes party to a standard written Dealer Agreement, the second part of which contains numerous "Standard Provisions." Paragraph 9C of that part of the agreement provides:

> Dealer shall neither sell or offer to sell for use in connection with MB passenger cars nor use in the repair or servicing of MB passenger cars any parts other than genuine MB parts or parts expressly approved by DBAG if such parts are necessary to the mechanical operation of such MB passenger cars.

Part one of the Dealer Agreement defines "MB parts" as "parts, accessories, components, assemblies, and optional equipment for MB passenger cars supplied by MBNA, DBAG, or DBNA."

In January, 1982, plaintiff-appellant Mozart, successor in interest to Eurasian Automotive Products, Inc., a wholesale automotive parts distributor, brought suit against MBNA for alleged violations of §§ 1 and 2 of the Sherman Act, and § 3 of the Clayton Act, 15 U.S.C. §§ 1, 2, and 14. Mozart based its case on Paragraph 9C of the Dealer Agreement between MBNA and each Mercedes–Benz franchised dealer. It contended that it constituted a per se tying violation of 15 U.S.C. §§ 1 and 14. Mozart alleged additionally that MBNA conspired with the franchised dealers to boycott independent replacement parts distributors, in further violation of § 1, and also that MBNA attempted to monopolize the sale in the United States of replacement parts usable in Mercedes automobiles in violation of § 2. The complaint charged improper conduct between the years 1975 and 1979.

In September, 1984, the district court denied the parties' cross-motions for summary judgment in a published opinion and order. *Mozart Co. v. Mercedes–Benz of N. Am., Inc.*, 593 F.Supp. 1506 (N.D.Cal.1984). The court found that the Mercedes passenger car and its replacement parts were separate products tied together by the terms of Paragraph 9C of the MBNA Dealer Agreement, and that the tying arrangement affected a substantial amount of interstate commerce. *Id.* at 1523. The matter proceeded to trial on the issues of: (1) whether MBNA had sufficient economic power in the tying product market to restrain competition in the tied product market; (2) whether MBNA had a legitimate business justification for the tying arrangement; and (3) the conspiracy and monopoly claims. *Id.* at 1523–24.

Trial began August 6, 1985. At the close of Mozart's case in chief, the court granted MBNA's motion for a directed verdict on the conspiracy to boycott claim. At the close of all the evidence, the court submitted the case to the jury only under the Sherman Act § 1 tying claim. It declined to give to the jury the attempted monopolization and Clayton Act § 3 claims. The jury returned a special verdict, finding that MBNA had violated Sherman Act § 1 under both the per se test and the Rule of Reason Test, but that MBNA had a business justification for its tying arrangement. The district court untangled matters by determining that MBNA had not violated § 1.[1] The court denied Mozart's motion for judgment notwithstanding the verdict. The district court then directed a verdict for MBNA on the Clayton Act § 3 and Sherman Act § 2 claims. On November 20, 1985, the court rendered its final judgment that Mozart take nothing. Mozart timely filed a notice of appeal. On June 2, 1986, the district court taxed costs of $110,877.23 against the plaintiff. Mozart also filed an appeal from this post-judgment order.

As indicated above, we affirm. To do so we need address in depth only appellant's contentions that the district court erred in refusing to invoke collateral estoppel as appellant insisted it should and that the business justification defense was inapplicable as a matter of law. First, however, we shall explain why these two issues are controlling in our view.

---

1. Technically, there is no "violation" of the Sherman Act if the defendant prevails on a business justification defense. *See infra* section IV.

## II.

### THE PER SE TYING STANDARD

█ In *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), a bare majority reaffirmed the per se rule against tying.[2] The majority opinion concluded that it was "far too late in the history of our antitrust jurisprudence to question the proposition that certain tying arrangements pose an unacceptable risk of stifling competition." *Id.* at 9, 104 S.Ct. at 1556. Three elements are necessary to establish a per se illegal tying arrangement: "(1) a tie-in between two distinct products or services; (2) sufficient economic power in the tying product market to impose significant restrictions in the tied product market; and (3) an effect on a non-insubstantial volume of commerce in the tied product market." *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys.*, 732 F.2d 1403, 1407 (9th Cir. 1984). As stated previously, the district court determined as a matter of law that the Mercedes passenger car and its replacement parts were separate products tied together by the terms of paragraph 9C of the MBNA Dealer Agreement, and that the tying arrangement affected a substantial amount of interstate commerce. 593 F.Supp. at 1523. The market power issue, the second element of the per se standard, was submitted to the jury, and the jury found that MBNA possessed the requisite power in the tying product, the Mercedes passenger car.

The majority in *Hyde*, rather than abandoning the per se rule against tying, chose to limit antitrust liability for tie-ins by insisting on a showing of actual market power in the tying product. 466 U.S. at 13–17, 104 S.Ct. at 1558–61. Tying arrangements receive per se condemnation "when the seller has some special ability—usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market." *Id.* at 13–14, 104 S.Ct. at 1558–59. The primary purpose of the rule against certain tying arrangements is to stop the extension of market power from one product to another.[3] *Id.* at 13 & n. 19, 104 S.Ct. at 1558 & n. 19. Such extension of power is impossible unless the seller has substantial market power in the tying product.

The instructions employed in submitting this issue to the jury were flawed, however. That flaw pertained to the "market power" that the defendant must possess in the tying product to justify the invocation of the per se standard. The required "market power" must be sufficient "to force a purchaser to do something he would not do in a competitive market." 466 U.S. at 14, 104 S.Ct. at 1559. Such "forcing" is the equivalent of increasing the price of the tying product to increase profits. *Id.* at 27 n. 46, 104 S.Ct. at 1566 n. 46. Such power is the hallmark of monopoly power, *viz.*, the ability to increase price by restricting output.

In *Hyde*, the Court identified three sources of market power. First, when the

2. Two Justices relied on Congress' silence as a justification for preserving the per se rule. *See* 466 U.S. at 32, 104 S.Ct. at 1568 (Brennan, J., concurring). Four Justices, recognizing that tying arrangements may have procompetitive effects, would analyze these arrangements under the Rule of Reason. *See id.* at 32–47, 104 S.Ct. at 1568–76 (O'Connor, J., concurring). Thoughtful antitrust scholars have expressed serious doubts about the alleged anticompetitive effects of tie-ins. *See* 5 P. Areeda & D. Turner, *Antitrust Law* ¶¶ 1129c, 1134b (1980); R. Bork, *The Antitrust Paradox* 372–75 (1978); *see also Hirsh v. Martindale-Hubbell, Inc.*, 674 F.2d 1343, 1349 n. 19 (9th Cir.) (criticizing reasons asserted in support of the antitrust law's harsh treatment of tying arrangements), *cert. denied*, 459 U.S. 973, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982). The close division on the rationale in *Hyde* was

attributable in part to the debate over whether tying arrangements raise antitrust concerns.

3. This so-called "leverage theory" has been criticized because modern economic thought seems to indicate that all available monopoly profits could be obtained from the tying product alone without the use of a tie-in. *See* R. Bork, *supra*, at 373. Tying arrangements are also viewed with disfavor because they can be used to facilitate price discrimination. Where the quantity of sales of the tied product measures the buyer's intensity of use of the tying product, the seller may be able to exact a premium from the more intensive users by charging above-cost prices for the tied product. There are no allegations that the tying arrangement here fosters price discrimination.

government has granted the seller "a patent or similar monopoly over a product, it is fair to presume that the inability to buy the product elsewhere gives the seller market power." 466 U.S. at 16, 104 S.Ct. at 1560 (citing *United States v. Loew's, Inc.,* 371 U.S. 38, 45–47, 83 S.Ct. 97, 102–03, 9 L.Ed.2d 11 (1962)). The second is when "the seller's share of the market is high." *Id.* 466 U.S. at 17, 104 S.Ct. at 1560 (citing *Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 611–13, 73 S.Ct. 872, 881–83, 97 L.Ed. 1277 (1953)). The third is when "the seller offers a unique product that competitors are not able to offer." *Id.* Mozart's theory of this case is that the Mercedes automobile is sufficiently unique to confer economic power on MBNA in the tying product.

■ The district court properly instructed the jury that the Mercedes–Benz franchise trademark and the Mercedes–Benz automobiles together constitute the tying product. Reporter's Transcript (R.T.) of Oct. 18, 1985, at 23. The jury also was instructed, in part, as follows:

> In deciding whether MBNA had sufficient leverage, you may consider the fact that MBNA controlled who could use the Mercedes trademark and whether the trademark had any goodwill among the car-buying public. A prestigious and desirable trademark can be persuasive evidence of economic power.

> MBNA had the necessary leverage if the evidence shows that the Mercedes automobile was sufficiently unique to give MBNA a competitive advantage in the sale of automobiles. If new Mercedes cars were sufficiently desirable to dealers, then MBNA was likely to have sufficient leverage to restrain the tied

product market; that is, the market for replacement parts sold to Mercedes dealers and necessary to the mechanical operation of the Mercedes car.

*Id.* at 26. These two instructions reveal the flaws referred to above.

First, a prestigious trademark is not itself persuasive evidence of economic power. It is true that we have previously held that *copyright* protection may be evidence of market power because it creates barriers to entry for competitors in the tying market. *Digidyne Corp. v. Data Gen. Corp.,* 734 F.2d 1336, 1341 (9th Cir.1984), *cert. denied,* 473 U.S. 908, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985).[4] However, unlike a patent or copyright, which is designed to protect the uniqueness of the product itself, a trademark protects only the name or symbol of the product. Market power, if any, is derived from the product, not from the name or symbol as such. *See* Klein & Saft, *The Law and Economics of Franchise Tying Contracts,* 28 J.Law & Econ. 345, 356 (1985).

Second, the court's instructions indicate that somehow market power can be proven from the uniqueness of the Mercedes automobile. The difficulty with this is that while many individual purchasers of automobiles undoubtedly regard a Mercedes as unique, it is by no means clear that franchisees (dealers) view the Mercedes in the same manner. To them it is an article that is purchased at wholesale and sold at retail. The critical issue is whether MBNA possesses the "market power" to force dealers to purchase the tied product rather than acquire the franchise to sell a different automobile. Obviously there are costs in surrendering one franchise and acquiring another, but these are costs unrelated to

**4.** To the extent that the panel's opinion in *Digidyne* indicates that the presumption of market power is warranted merely by the existence of copyright protection, the *Digidyne* view has been rejected by several courts and commentators. *See, e.g., A.I. Root Co. v. Computer/Dynamics, Inc.,* 806 F.2d 673, 676 (6th Cir.1986); *Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 673 n. 4 (7th Cir.1985), *cert. denied,* 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986); Note, *The Presumption of Economic Power for Patented and Copyrighted Products in*

*Tying Arrangements,* 85 Colum.L.Rev. 1140, 1156 (1985); *see also Hyde,* 466 U.S. at 37 n. 7, 104 S.Ct. at 1571 n. 7 (O'Connor, J., concurring) (patent holder has no market power if there are close substitutes for the patented product). Two Justices who favor retention of the per se rule against tie-ins would have granted certiorari in *Digidyne* because of the panel's failure to engage in market analysis. *See* 473 U.S. 908, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985) (White, J., joined by Blackmun, J., dissenting from denial of certiorari).

the "market power" of a unique automobile. These costs will enable the car maker to extract concessions from the dealer, but this power is related to the franchise method of doing business, not to the possible uniqueness of the car. The upshot is that the district court's jury charge was improperly focused. It fails to anticipate adequately the basic fact that the "market" at issue is the market for dealership franchises.

However, we do not find that the flawed instructions necessitate a reversal of the judgment. The instructions were more favorable to the appellant than would be a proper recasting. We turn now to the crucial issues of this case.

### III.

### COLLATERAL ESTOPPEL

█ It so happened that *Metrix Warehouse, Inc. v. Daimler–Benz Aktiengesellschaft,* No. CV–N–79–2066, was pending in the federal district court for the District of Maryland as this case unfolded below. The *Metrix* case involved claims and issues quite similar to those in this case. Metrix, an independent distributor of replacement parts, brought suit against MBNA on a tying charge under Sherman Act § 1. The jury in *Metrix,* rejecting the business justification defense accepted by the jury in this case, returned a verdict against MBNA for damages of $2.3 million, and judgment upon that verdict was entered. These events occurred before the present case went to trial.

Based upon the jury verdict in *Metrix,* Mozart moved to have MBNA adjudicated as collaterally estopped from contesting its liability under Sherman Act § 1. On June 3, 1985, the district court tentatively ruled that there was a collateral estoppel. Court Record (C.R.) at 547. However, on June 19, 1985, the *Metrix* court awarded a new trial on the issue of damages. Upon this new development the district court in this case refused to apply collateral estoppel. The court ruled that the judgment in *Metrix* lacked the requisite degree of finality to support collateral estoppel. C.R. at 548.

On October 7, 1985, the *Metrix* court granted MBNA leave to file an interlocutory appeal with respect to liability and several other issues under 28 U.S.C. § 1292(b). The Fourth Circuit accepted the appeal, and a cross-interlocutory appeal by *Metrix,* and decided the case on September 14, 1987, a date subsequent to the submission of this appeal for decision. *See Metrix Warehouse, Inc. v. Daimler–Benz Aktiengesellschaft,* 828 F.2d 1033 (4th Cir. 1987). The issues disposed of by the Fourth Circuit are succinctly stated to have been as follows:

As presented by the parties on appeal, and as interpreted by this court, the issues raised by the certified questions are whether *Pick Manufacturing Co. v. General Motors Corp.,* 80 F.2d 641 (7th Cir.1935), *aff'd per curiam,* 299 U.S. 3 [57 S.Ct. 1, 81 L.Ed. 4] (1936), established an automobile exception to Sherman Act liability for tying arrangements; whether MBNA proved as a matter of law that its tying arrangement was based on a legitimate business justification; whether the jury's Sherman Act damage award was against the clear weight of the evidence; and whether the district court misapplied the standards for granting a judgment notwithstanding the verdict or, alternatively, a new trial on MBNA's Robinson–Patman Act counterclaim.

*Id.* at 1035 n. 4.

The Fourth Circuit's disposition of these issues was (1) that *Pick* did not establish a "broad-based exception to the Sherman Act," *id.* at 1039; (2) that MBNA's evidence in support of its business justification defense would not support a directed verdict and judgment notwithstanding the verdict and that the jury instructions with respect to the burden of proving business justification were not improper; (3) that the trial court did not abuse its discretion in granting MBNA a new trial on damages, *id.* at 1042–45; and (4) that the district court erred in granting a judgment notwithstanding the verdict, or, alternatively, a new trial on MBNA's Robinson–Patman Act counterclaim.

Mozart in its briefs and oral argument insisted that, even though the Fourth Circuit's decision in *Metrix* had not been handed down, it nonetheless collaterally estopped MBNA from contesting its Sherman Act liability. This led to argument concerning the type of finality that a prior judgment must have to permit its use for purposes of collateral estoppel. *See Luben Indus. v. United States,* 707 F.2d 1037 (9th Cir.1983). Also at issue was the point in time such required finality must be attained to justify overturning a judgment of the district court which, as is the situation in the case before us, had refused to invoke collateral estoppel.

The Fourth Circuit's decision significantly alters the focus of our concerns. We recognize that its decision possesses the required attributes of finality. We also are now persuaded that the fact that this decision is subsequent in time to the district court proceedings in the case before us does not bar any preclusive effect that the *Metrix* case might possess. In reaching this conclusion, we are guided by *Los Angeles Unified School District v. Los Angeles Branch, NAACP,* 714 F.2d 935, 939–40 (9th Cir.1983), which gave a state court decision, that became final after the judgment of the district court, preclusive effect on the review of that judgment on appeal. Therefore, we now turn our attention to *Metrix* to determine whether it affords Mozart the means by which the jury verdict against it can be overturned.

We hold that it does not. We start from the proposition that the case before us is based on different evidentiary facts from those in *Metrix.* Moreover, *Metrix* involved no principle of law that should collaterally estop MBNA from asserting its business justification defense and from resisting successfully any effort to overturn the jury verdict in its favor.

The precise holdings of the *Metrix* court make this clear. The rejection of *Pick* as the basis of any exception to the Sherman Act by *Metrix* does not impair MBNA's jury verdict. It never seriously relied on *Pick.* More importantly, it did not win on that basis. Its victory rested on the acceptance by the jury of MBNA's business justification defense. *Metrix* did not reject the business justification defense; it merely held that in that case the evidence presented by MBNA to make out that defense was not sufficiently strong to support setting aside a jury verdict holding that no such defense was established. MBNA in this case established to the satisfaction of the jury that a business justification did exist. It would be a curious use of affirmative collateral estoppel to permit one who had lost before the jury on certain facts to overturn that verdict by pointing out that on different facts, but identical legal principles, the winner before the jury had lost a jury verdict to a stranger on an earlier day and in a different court. Issue preclusion in its affirmative form is not that expansive. Finally, it is abundantly clear that the *Metrix* holdings regarding the granting a new trial on damages and the Robinson–Patman Act counterclaims have no bearing on this case.

We hold, therefore, that the district court did not abuse its discretion in refusing to permit Mozart to invoke collateral estoppel.

## IV.

### BUSINESS JUSTIFICATION

This brings us to the heart of this case, whether the tying arrangement was justified by business necessity. We have recognized that antitrust defendants may demonstrate a business justification for an otherwise per se illegal tying arrangement.[5] *Roberts v. Elaine Powers Figure*

---

5. It may seem somewhat anomalous to permit justifications for arrangements that are apparently subject to per se condemnation. However, per se rules are simply examples of presumptions that exist throughout antitrust law, and "easy labels do not always supply ready answers." *Broadcast Music, Inc. v. Columbia Broadcasting Sys.,* 441 U.S. 1, 8, 99 S.Ct. 1551,

1556, 60 L.Ed.2d 1 (1979). Before applying the per se label we must determine whether the challenged practice is one of those types that "is 'plainly anticompetitive' and very likely without 'redeeming virtue.'" *Id.* at 9, 99 S.Ct. at 1557. Allowing the defendant to assert a business justification defense is one way of inquiring into whether the reasons for the relatively categori-

*Salons, Inc.*, 708 F.2d 1476, 1482 (9th Cir. 1983); *Betaseed, Inc. v. U and I Inc.*, 681 F.2d 1203, 1225–28 (9th Cir.1982); *Phonetele, Inc. v. American Tel. & Tel. Co.*, 664 F.2d 716, 738–39 (9th Cir.1981), *cert. denied*, 459 U.S. 1145, 103 S.Ct. 785, 74 L.Ed. 2d 992 (1983); *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1217 (9th Cir.1977). A tie-in does not violate the antitrust laws "if implemented for a legitimate purpose and if no less restrictive alternative is available." *Phonetele*, 664 F.2d at 739. The defendant bears the burden of showing that the case falls within the contours of this affirmative defense. *Id.*

The justification asserted by MBNA is that the tying arrangement is necessary to assure quality control and to protect its goodwill. The difficulty confronting MBNA is the problem of "freeriding" by Mercedes dealers. To MBNA it is crucial that a dealer operating under a franchise distribution arrangement offer standardized products. Only then can customers confidently rely on the Mercedes name. Franchisees, on the other hand, experience a conflict of interest. True, they wish to maintain the goodwill of MBNA, but some will yield to avarice and increase their profits by supplying inferior products while continuing to attract customers at the expense of those dealers who conform to the quality standards. The cost of these transgressions will be borne by all franchisees in the form of decreased future demand. Although a consumer may realize that a particular franchisee "cut the corner," the adverse reaction of consumers as a group is not confined to that particular franchisee because they are appropriately reacting to the poor job of policing done by the franchisor. In plain fact, the "corner cutter"

imposes costs on all concerned with the product.

■ To exonerate a franchisor's tie-in quality control technique from the antitrust law, there must be a finding that no less restrictive alternative exists.[6] Frequently less restrictive alternatives do exist. *See e.g., Standard Oil Co. v. United States*, 337 U.S. 293, 305–06, 69 S.Ct. 1051–58, 93 L.Ed. 1371 (1949); *International Salt Co. v. United States*, 332 U.S. 392, 397–98, 68 S.Ct. 12, 15–16, 92 L.Ed. 20 (1947); *International Business Machs. Corp. v. United States*, 298 U.S. 131, 138–40, 56 S.Ct. 701, 704–05, 80 L.Ed. 1085 (1936); *Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39, 46–47 (5th Cir.1976); *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 51 (9th Cir.1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972).

It has been suggested that the quality control defense be viewed with less skepticism than it usually has been accorded. It has been argued that tying arrangements are more effective and less costly than alternative methods for ensuring franchisee compliance with quality specifications. Simply specifying quality standards contractually will be ineffective because, as already pointed out, the franchisee has a financial incentive to "cut corners," to "freeride." The franchisor must police compliance with the specifications, and policing costs will be substantial, if not prohibitive. The fact that quality specification is possible does not mean, therefore, that the tie-in is not necessary to assure high-quality products. *See* Klein & Saft, *supra*, at 351–54 (discussing tie-ins as a mechanism to economize on policing costs). Furthermore, penalties against the "corner cutters" must be imposed. Termination of

cal historical condemnation of tie-ins apply to the challenged arrangements.

**6.** The most notable exception to the general rejection of the quality control defense is *United States v. Jerrold Electronics Corp.*, 187 F.Supp. 545 (E.D.Pa.1960), *aff'd per curiam*, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961). There the court held that Jerrold's requirement that buyers of its television system also purchase installation and repair service was necessary to protect Jerrold's business reputation. *Id.* at 557–60. However, the court seemed to limit the

defense to nascent firms entering a technologically complex industry. *Id.* at 560.

The quality control defense was also successful in *Susser v. Carvel Corp.*, 332 F.2d 505 (2d Cir.1964), *cert. dismissed*, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965). The *Susser* court held that the tie of ice cream purchases to a trademark license was legitimate because it would have been difficult to specify contractually the "desired texture and taste of an ice cream cone or sundae." *Id.* at 520.

the "corner cutter's" franchise may be difficult to achieve because, *inter alia*, inasmuch as standards generally do not capture all elements of quality, breach may be difficult to prove. *Id.* at 353 & n. 26.

Designating particular suppliers, a possible alternative to quality specification, requires policing compliance at the manufacturer level, which may be just as difficult as at the franchisee level. Moreover, the suppliers also will be under competitive pressure to "cut corners" by supplying low-quality products to franchisees who are more concerned with price than quality. Even if the franchisor buys from the same suppliers as do the franchisees, there is no certainty that the products purchased by franchisees will be of equal quality. To ascertain the quality of parts purchased by franchisees would require quality control testing at the franchisee level. In sum, designating a supplier would require testing at both supplier and purchaser-franchisee level. For these reasons, it has been argued that the efficiency loss from alternative methods of quality control may outweigh any potentially anticompetitive effects of a tying arrangement. With this background we now turn to the alleged justification in this case.

We begin with the fact that, pursuant to instructions that Mozart does not, and could not, challenge, the jury found in MBNA's favor. These instructions were in accordance with the prevailing law regarding business justification.[7] Mozart, from necessity, rests its appeal on a challenge to the sufficiency of the evidence. We will affirm the jury verdict and the denial of Mozart's motion for judgment n.o.v. if there is substantial evidence to support a finding for MBNA. *Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1442 (9th Cir.1986). We are not free to reweigh the evidence or reach a result we find more reasonable if, viewing the evidence in the light most favorable to MBNA, there is substantial evidence in favor of the jury's verdict. *Wilcox v. First Interstate Bank*, 815 F.2d 522, 525 (9th Cir.1987).

Mozart contends that the business justification defense fails for two reasons: 1) the quality control justification is without merit, because replacement parts of appropriate design and quality are available from other sources, and 2) even if the quality control concern is legitimate, less restrictive alternatives for achieving the same goal are available.

■ Substantial evidence exists to support MBNA's claim that the tie-in was used to assure quality control. MBNA purchases approximately 80% of its replacement parts from DBAG. Of those parts half are manufactured by DBAG itself, and half are acquired by DBAG from other original equipment manufacturers (OEMs). These OEMs produce the parts according to DBAG manufacturing and quality control specifications. A selection of each ship-

---

**7.** The instructions were as follows:

If you find that the tying agreements in this case were unlawful either because they were *per se* violations of the Sherman Act or because they were unreasonable under the Rule of Reason test, you must then determine whether they were warranted by a business justification. The burden is on the defendant to demonstrate the existence of a business justification. And again, you will recall the burden of proof that I explained to you earlier, but for this purpose, that burden is upon the defendant.

In considering the question of business justification, you must bear in mind that a tying agreement can be justified only if there is no less restrictive alternative. Even if some sort of regulation is reasonably necessary to promote the business of the parties, a less restrictive regulation must be adopted instead of a more restrictive one. No anticompetitive restraint is permissible which is broader or more onerous than reasonably necessary to achieve a goal even where the goal is legitimate.

Defendant's claimed business justification is that the restraint protected the quality of the Mercedes automobile. In order to establish its business justification defense, defendant must show that the tying arrangement was necessary to protect the quality of the automobiles, and that replacement parts of appropriate quality are unavailable from sellers other than defendant itself. In other words, defendant cannot prevail on its business justification defense unless it has sustained its burden of proving that its tying arrangement is the only way the safety and quality of MB cars can be assured.

R.T. of Oct. 18, 1985, at 40–41.

ment of OEM parts, which has already passed through one round of inspection, is tested a second time by DBAG. If any of the test parts is deficient, the whole lot is rejected. The remaining 20% of the replacement parts purchased by MBNA come directly from OEMs that have met DBAG's quality and inspection standards. Thus, most, but not all, of MBNA parts are subjected to DBAG's elaborate and rigorous inspection procedures. Mozart purchased most of the parts it sold from OEMs in the United States.

MBNA introduced evidence showing that DBAG's strict testing standards helped to assure the high quality of replacement parts. R.T. at 31–13 to 25; 19–45 to 49. MBNA maintains an excellent reputation in the automobile industry for reliable service and quality replacement parts. In fact, 75% of Mercedes automobile owners are repeat purchasers, and over one-third of the owners return to the dealer for service and repairs. *Id.* at 29–179 to 29–190. There was considerable testimony by dealers and employees of MBNA about the inferiority of parts supplied by independent jobbers. *Id.* at 25–180 to 183; 23–17, 18; 28–104 to 107· 29–130 to 133; 31–5 to 31–12. Although Mozart introduced evidence to the contrary, the jury was entitled to make credibility determinations in favor of MBNA. We hold that there was ample evidence to support a finding that the tying arrangement is a legitimate means of maintaining the quality of Mercedes replacement parts supplied by dealers, and thereby protecting the reputation of the MBNA product.

Mozart argues alternatively that, even if MBNA's alleged justification is legitimate, the quality control defense fails because MBNA neglected to utilize less restrictive alternatives. The jury's verdict could have been reached only by its determination that there was no less restrictive alternative. *See* R.T. of Oct. 18, 1985, at 40–41. No other conclusion is possible so long as it is assumed, as we must, that the jury followed its instructions.

Mozart insists that MBNA could have furnished manufacturing specifications for replacement parts, and that such specification would eliminate the need for a tie-in. The jury rejected this contention. Mozart is right, of course, when it insists that MBNA could have furnished design specifications for Mercedes replacement parts. That alone, however, does not eliminate the business justification defense. MBNA proffered evidence that DBAG's vigorous testing programs could not be replicated by individual dealerships. *Id.* at 31–38, 39; 27–8, 9; 22–40 to 42. The evidence further indicates the impracticality of Mozart's suggestion that MBNA could have inspected all replacement products furnished to independents. There was evidence from which the jury could find that the cost of such an undertaking would be prohibitive. We do not believe MBNA was required as a matter of law to take such extreme steps to protect its legitimate interest in assuring public confidence in the quality of its trademarked product. There is substantial evidence to support the jury's finding that the only feasible method for maintaining quality control is the use of the tying arrangement. Therefore we affirm the judgment for MBNA on the Sherman Act § 1 tying claim.

## V.

## OTHER CLAIMS

In addition to the claim of illegal tying, Mozart slightly recast that claim by alleging the MBNA engaged, with its dealers, in a conspiracy to boycott independent distributors. The district court granted a directed verdict for MBNA at the close of plaintiff's evidence. A defendant may "rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice." *Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir. 1987). "Once a defendant has met this initial burden, a plaintiff must provide specific factual support for its allegations of conspiracy tending to show that the defendant was not acting independently." *Id.*

MBNA offered the plausible business justification of quality control as a reason

for its "tying" agreements with all 400 dealers. Mozart points to no specific evidence tending to establish that MBNA was acting in concert with its dealers to protect MBNA and the dealers from competition. We, therefore, affirm the district court's directed verdict on the conspiracy to boycott claim.

Mozart also contests the district court's grant of a directed verdict on its Clayton Act § 3 claim and its Sherman Act § 2 attempt to monopolize claim. The district court held that the jury's finding of business justification disposed of these claims as well as the Sherman Act § 1 tying claim.

 We have stated that the elements for establishing a Sherman Act § 1 claim and a Clayton Act § 3 claim are virtually the same. *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1189 n. 2 (9th Cir.1984), *cert. denied*, 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985). There is no reason for allowing a business justification for a § 1 claim and not for a § 3 claim. To our knowledge no court has ever made such a distinction. Courts permit a business justification defense to tying claims because of a frank recognition that a package transaction with substantial justifications and few harmful effects should not be condemned. That recognition applies with equal force to the Sherman Act and the Clayton Act. The § 3 claim falls with the § 1 claim.

In order to support an attempt to monopolize claim the plaintiff must prove specific intent, which must be shown by proof of unfair or predatory conduct. *Drinkwine v. Federated Publications*, 780 F.2d 735, 740 (9th Cir.), *cert. denied*, 475 U.S. 1087, 106 S.Ct. 1471, 89 L.Ed.2d 727 (1986). Predatory conduct is "conduct that is in itself an independent violation of the antitrust laws or that has no legitimate business justification other than to destroy or damage competition." *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986).

 A tying agreement supported by a legitimate business justification cannot be characterized as the type of predatory anti-competitive, or unfair conduct that is necessary to support a Sherman Act

§ 2 claim. Mozart's failure to prove its tying claim precludes it from asserting an attempt to monopolize claim arising out of the same conduct. *See Airweld*, 742 F.2d at 1191 n. 3.

The district court properly granted a directed verdict on the Clayton Act § 3 and the Sherman Act § 2 claim.

## IV.

## COSTS

Mozart seeks to have the award of costs against it overturned. Because we affirm the judgment for MBNA, we also affirm the award of costs against Mozart. Costs of this appeal are also assessed against Mozart.

The judgment of the district court is AFFIRMED.