**Milton TOMINAGA, Plaintiff,**

v.

**Vance SHEPHERD, et al., Defendants.**

**No. CV 87–0172–ER.**

United States District Court, C.D. California.

April 6, 1988.

Paul Sigelman, Beverly Hills, Cal., for plaintiff.

Royce H. Schulz, John E. Rumel and Thomas D. Nevins, Broad, Schulz, Larson & Wineberg, Los Angeles, Cal., for defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

RAFEEDIE, District Judge.

The captioned case came on for hearing before this Court, the Honorable Edward Rafeedie, United States District Judge, presiding, on March 21, 1988, on the motion of defendants El Centro Foods, Inc. and Vance Shepherd, for summary judgment. Plaintiff Milton Tominaga, doing business as PM Distributors, was represented by Paul Sigelman. Defendants were represented by John E. Rumel of Broad, Schulz, Larson & Wineberg.

The Court, having read and considered the papers in support of and in opposition to the motion, finds that summary judgment is appropriate for all plaintiff's claims except the claim for interference with economic advantage or contractual relations.

Defendants El Centro and Vance Shepherd move this court to grant summary judgment on plaintiff's Complaint. The Complaint alleges violations of section 1 of the Sherman Act, and section 3 of the Clayton Act (tying arrangement, group boycott, refusal to deal), as well as the following state law claims: unfair competition, interference with contract or prospective advantage, and violation of the implied covenant of good faith and fair dealing.

### FACTUAL BACKGROUND

Defendant El Centro is a California corporation and is the franchisor of "Pizza Man—He Delivers" and "Chicken Delight" franchises in Los Angeles and Orange Counties. There are currently forty-five Pizza Man, six combination Pizza Man and Chicken Delight, and one Chicken Delight franchisees in the Southern California area. Defendant Vance Shepherd is the president of El Centro. El Centro has registered its Pizza Man and Chicken Delight service marks with the United States Patent and Trademark office.

Plaintiff Milton Tominaga does business as P.M. Distributors in the Los Angeles area, and is a wholesale distributor of ingredients for prepared foods and restaurant supplies. He is an authorized distributor of food and packaging products to El Centro's franchisees. Tominaga owned a franchised store from 1975 until 1985. From 1982 to the present, he supplied various Pizza Man franchises with ingredients and supplies. In 1985, Tominaga sold his Pizza Man store, according to his affidavit, because defendant Shepherd told him he would become the exclusive distributor for Pizza Man ingredients and supplies.

El Centro franchisees entered into a franchise agreement with El Centro in order to obtain licenses to operate Pizza Man stores (all facts pertaining to Pizza Man should be assumed to apply to Chicken Delight unless otherwise noted) and to utilize the service mark. Under the franchise agreement, a franchisee is not limited to purchasing its food products and supplies from any one distributor:

> a franchisee may purchase any and all authorized food products and packaging from suppliers of his choice, provided that such food and packaging are uniform and high quality and comply with the standards and specifications set forth in the Operations Manual.

Also, under the standard form franchise agreements, each El Centro franchisee is obligated to package all goods sold to the public in approved Pizza Man packaging unless such packaging is unavailable, in which case written permission must be obtained from El Centro. Each franchisee is further required to prepare its menu and use ingredients in accordance with the methods and specifications set forth in the Pizza Man Operations Manual.

Tominaga was an authorized distributor of packaging materials and refrigerated food products, however, Tominaga was never the exclusive Pizza Man distributor (although Tominaga states that he was promised an exclusive dealership). There are substantial factual disputes as to Tomi-

naga's performance as a distributor, and the circumstances surrounding El Centro's entry into the market for the distributing packaging products to franchisees.

El Centro claims that Tominaga's conduct as a distributor of poor quality merchandise damaged its goodwill, as embodied in the service marks. Defendants have provided evidence that Tominaga provided substandard food and packaging products which did not meet El Centro's quality standards, and that he overcharged the franchisees. El Centro claims to have provided Tominaga with notice of its dissatisfaction on numerous occasions.

Tominaga disputes El Centro's charges, and claims that Vance Shepherd was angry with Tominaga when Tominaga refused to provide El Centro with a "kick back" from the manufacturers. When Shepherd offered to buy Tominaga out, Tominaga refused, and was allegedly threatened by Shepherd ("I'll break your back").

El Centro, on the other hand, argues that all its actions were based upon a perceived business need to standardize its distribution system and the quality of products delivered to the franchisees. This was the basis for El Centro's decision to enter into the distribution business, and its offer to buy out Tominaga.

In November of 1986, El Centro notified some of Tominaga's suppliers, as well as Tominaga, that El Centro would be the exclusive distributor of non-refrigerated and monogrammed goods bearing its service marks to Pizza Man franchisees. All franchisees were notified of this change, but were also told that Tominaga would continue to serve the franchisees with all refrigerated items and miscellaneous supplies. El Centro claims that the refrigerated items were the most expensive and most profitable items, while Tominaga complains that they are the least profitable items.

In April 1987, El Centro reinstated Tominaga's authorization to distribute goods bearing its service mark to its franchisees and notified the suppliers that Tominaga had been reinstated. Thus, since April, Tominaga and El Centro have competed for the franchisees' business.

## DISCUSSION

### I. STANDARD FOR SUMMARY JUDGMENT

The moving party is entitled to summary judgment when the non-moving party bears the burden of proof at trial as to an element essential to its case, and the party fails to make a showing sufficient to establish a genuine dispute with respect to the existence of that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In order to show that there are genuine factual issues that can properly be resolved only by a finder of fact, the non-moving party must show that the disputed facts may reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *California Architectural Bldg. Prod. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987).

### II. ANTITRUST CLAIMS

#### A. *Illegal Tying Arrangement Claim*

A "tying arrangement" occurs where a seller refuses to sell one product (the tying product) unless the buyer also purchases another product (the tied product). In *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), the Court reaffirmed the per se rule against tying.[1]

---

1. The per se rule was affirmed by a bare majority, and in the face of serious criticism by antitrust scholars. R. Bork, *The Antitrust Paradox*, 372–75 (1978); *Hirsh v. Martindale–Hubbell, Inc.*, 674 F.2d 1343, 1349 n. 19 (9th Cir.), *cert.* denied, 459 U.S. 973, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982); *Mozart Co. v. Mercedes–Benz of North America*, 833 F.2d 1342, 1345 n. 2, n. 3 (9th Cir.1987).

Thus, a tying arrangement is illegal per se where the controlling prerequisites are met. *Digidyne Corp. v. Data General Corp.*, 734 F.2d 1336 (9th Cir.1984), *cert denied,* 473 U.S. 908, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985). In order to prevail under a per se theory, plaintiff must establish the following three elements; "(1) a tie-in between two distinct products or services; (2) sufficient economic power in the tying product market to impose significant restrictions in the tied product market; and (3) an effect on a non-insubstantial volume of commerce in the tied product market." *Robert's Waikiki U–Drive, Inc. v. Budget Rent–A–Car Sys.*, 732 F.2d 1403, 1407 (9th Cir.1984). Plaintiff has failed to present competent evidence that El Centro had market power in the tying market.

It has been observed that the "per se" rule under which tying arrangements are analyzed is "unusual because of the essential role of economic analysis" in applying the standard. Klein & Saft, *The Law and Economics of Franchise Tying Contracts,* 28 J.Law & Econ. 345, 345 (1985) (cited with approval in *Mozart Co. v. Mercedes–Benz of North America,* 833 F.2d 1342, 1346 (9th Cir.1987)); *Hyde,* 466 U.S. at 34, 104 S.Ct. at 1570 (O'Conner concurring)[2]. As recognized by the court in *Mozart,* the majority in *Hyde,* "rather than abandoning the per se rule against tying, chose to limit antitrust liability for tie-ins by insisting on a showing of *actual market power in the tying product.*" *Mozart,* 833 F.2d at 1345 (emphasis added) (*citing, Hyde,* 466 U.S. at 13–17, 104 S.Ct. at 1558–1561).

Tying arrangements, therefore, receive per se condemnation only when "the seller has some special ability—usually called market power'—to force a purchaser to do something that he would not do in a competitive market." *Hyde,* 466 U.S. at 13–14, 104 S.Ct. at 1558–1559. Since the primary purpose of the rule is to prevent the extension of market power from the tying product to the tied product[3], market power is deemed an essential element because such an "extension of power is impossible unless the seller has substantial market power in the tying product." *Mozart,* 833 F.2d at 1345.

Courts have identified three sources of market power; (1) when the government has granted the seller "a patent or similar monopoly over a product," (2) when the seller's share of the market is high, and (3) when the seller offers a "unique" product that competitors are not able to offer. *Mozart,* 833 F.2d at 1345–1346. Prior to *Mozart,* antitrust plaintiff's would argue that market power could be presumed by virtue of the uniqueness of the trademark.

■ A distinctive trademark is "unique" in the sense that it constitutes an identifiable property right, but it should not be confused in the franchising context with

---

**2.** Although the Court has stated, in dicta, that tying arrangements serve "hardly any purpose beyond the suppression of competition," *Standard Oil Co. of California v. United States,* 337 U.S. 293, 305–306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949), "this declaration was not taken literally even by the cases that purport to rely upon it." *Hyde,* 466 U.S. at 34, 104 S.Ct. at 1563 (O'Conner concurring). "The Court has never been willing to say of tying arrangements, as it has of price fixing, division of markets, and other arrangements subject to per se analysis, that they are always illegal, without proof of market power or anticompetitive effect." *Id.*

**3.** There are three policy rationales for the per se rule against tying arrangements. The "primary purpose" is to prevent an extension of market power to a new product market. The so-called "leverage theory" has been criticized because "modern economic thought seems to indicate that all available monopoly profits could be obtained from the tying product alone without the use of a tie-in." *Mozart,* 833 F.2d at 1345 n.

3 (*citing,* Bork, *supra,* at 373); *Hyde,* 466 U.S. at 36, 104 S.Ct. at 1570–1571 (O'Conner, concurring). Tying arrangements have also been viewed as a method for facilitating price discrimination. *Id.* Such price discrimination occurs where the seller "meters" the buyers use of the tying product. *Hyde,* 466 U.S. at 36 n. 4, 104 S.Ct. at 1571 n. 4 (O'Conner, concurring). In this case plaintiff has made no such allegations. Furthermore, the proper party to bring suit under this theory, would be the franchisees not the distributors. Finally, in a regulated industry, a firm with market power may be unable to extract a supercompetitive profit because it lacks control over the prices it charges for regulated products or services. Tying may be used to extract that profit from the sale of unregulated tied products. *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 513, 89 S.Ct. 1252, 1263–1264, 22 L.Ed.2d 495 (1969) (White, dissenting).

the existence of market power. Klien & Saft, *supra,* at 355. In *Mozart,* the court held that a trademark is "not itself persuasive evidence of economic power." *Mozart,* 833 F.2d at 1346. As the court in *Mozart* recognized, market power is not derived from a name or symbol, but from the product itself. *Id. (citing,* Klien & Saft, *supra,* at 356).

In *Siegel v. Chicken Delight,* 448 F.2d 43 (9th Cir.1971), *cert denied,* 405 U.S. 955, 92 S.Ct. 1172, 1173, 31 L.Ed.2d 232 (1972), the court reasoned that Chicken Delight had sufficient market power because "[i]t can hardly be denied that the Chicken Delight trademark is distinctive; that it possesses goodwill and public acceptance unique to it and not enjoyed by other fast food chains." *Id.* at 50. This analysis, however, has been subjected to a crippling attack by Klien & Saft;

It makes no economic sense to attribute significant market power to the Chicken Delight trademark. The important economic distinction that must be made is between pre- and postcontract economic power. Precontract, competition among franchisors (such as McDonald's or Kentucky Fried Chicken) to sign up franchisees prevents Chicken Delight from exercising any economic power in setting contract terms with potential franchisees. Chicken Delight, although it possesses a trademark, does not possess any economic power in the relevant market in which it operates—the fast food franchising (or perhaps, more generally, the franchising) market.

Klien & Saft, *supra,* at 356; *Mozart,* 833 F.2d at 1346 ("Market power, if any, is derived from the product, not from the name or symbol as such").

 In this case, plaintiff argues that it need not rely upon a "presumption" of market power, because El Centro's activity is evidence of market power. Nevertheless, the above referenced analysis is useful in determining the merits of plaintiff's argument. Plaintiff charges that (1) El Centro demonstrated its market power by increasing prices of the service marked supplies, and foreclosing plaintiff from distributing such supplies; and (2) by "locking

in" franchisees to the tying product by virtue of their investment in the franchise.

Plaintiff's argument, however, fails to define the relevant market. In *Mozart,* the court emphasized the necessity of defining the relevant market.

The critical issue is whether MBNE [the Mercedes franchisor] possesses the "market power" to force dealers to purchase the tied product rather than acquire the franchise to sell a different automobile.

*Mozart,* 833 F.2d 1346. Thus, as recognized in *Mozart,* the relevant market would include other franchises for similar products. Possible relevant markets include take out pizza franchises, fast food franchises or restaurant franchises in general. Klien & Saft, *supra,* at 356 (the relevant market in *Chicken Delight* was the fast food franchising market, or perhaps more generally, the franchising market).

Plaintiff's implicit argument is that the relevant market is the "Pizza Man franchising" market. This market definition is erroneous as a matter of law. No reasonable argument can be made that Pizza Man possesses the power to coerce potential franchisees to purchase the tied product rather than sell a different brand of fast food (the tying product). The analysis must take place at the "pre-contract" stage. Klien & Saft, *supra,* at 356. Plaintiff, however, engages in "post-contract" analysis concerning defendant's power over already existing franchisees by virtue of their "sunk costs." This argument was explicitly rejected in *Mozart.*

Obviously there are costs in surrendering one franchise and acquiring another, but these costs are unrelated to the "market power" of a unique automobile. These costs will enable the car maker to extract concessions from the dealer, but this power is related to the franchise method of doing business, not to the possible uniqueness of the car.

*Mozart,* 833 F.2d at 1346–47. The court concluded that the district court's jury instruction was "improperly focused" on the particular franchise [Mercedes dealerships], and failed to recognize that the

"market" at issue "is the market for dealership franchises." *Id.* [4]

Therefore, plaintiff's argument that the evidence submitted shows there is a material issue of fact as to defendant's market power is based on an improper market definition. El Centro's ability to "coerce" its franchisees to purchase a product it may not wish to purchase (postcontract), and its claimed ability to raise prices because of the franchisees sunk investment, does not show market power in the fast food franchising market. The "power" exercised is merely the power of a franchisor over its franchisees. Nothing in the record shows that El Centro had the power (precontract) to "force" potential franchisees to purchase the tied goods. Such power could only be exercised by El Centro if the relevant market for the tying product were Pizza Man franchises. No such showing has been made, nor could such a showing be made.

Plaintiff relies upon *Digidyne Corp. v. Data General Corp.*, 734 F.2d 1336, 1341 (9th Cir.1984), *cert denied*, 473 U.S. 908, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985). In *Digidyne*, the court held that market power will be found were defendant is able to "lock in" the tied product when a customer has made a substantial investment in the tying product. The court in *Mozart* distinguished *Digidyne* on the grounds that it concerned a unique, copyrighted tying product, whereas *Mozart*, as our case, concerns a trademark tying product [Mercedes dealerships and Pizza Man stores]. Moreover, the court in *Mozart* suggested that the *Digidyne* panel erred in failing to engage in market analysis. *Mozart*, 833 F.2d at 1346 n. 4. In any event, the case before

this court is on all fours with that before the *Mozart* panel.[5]

Therefore, plaintiff has failed to produce evidence creating a material issue of fact concerning El Centro's market power in the tying product, and summary judgment is appropriate.

## III. GROUP BOYCOTT OR CONCERTED REFUSAL TO DEAL
### *Per Se Rule for Horizontal Conspiracy*

■ The Supreme Court applies a per se rule to group boycotts or concerted refusals to deal. *A.H. Cox & Co. v. Star Machinery Co.*, 653 F.2d 1302, 1305 (9th Cir. 1981). The Ninth Circuit limits application of the per se rule against group boycotts or concerted refusals to deal to "concerted activity between two or more horizontal competitors." *Cascade Cabinet Co. v. Western Cabinet & Millwork*, 710 F.2d 1366, 1370 (9th Cir.1983). Some horizontal concert of action must be taken against the victims of the restraint in order for the per se rule to apply. *Gough v. Rossmoor Corp.*, 585 F.2d 381, 387 (9th Cir.1978), *cert denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). The per se rule is never applied automatically when the concerted refusal to deal is vertical, rather than horizontal. *A.H. Cox*, 653 F.2d at 1306.

■ The first question, therefore, is whether the refusal to deal alleged involves concerted action between competitors. Plaintiff argues that El Centro conspired with Dixie Sales to carve plaintiff out from the distribution business. Plaintiff claims that the deal was that El Centro would sell

---

**4.** Klien & Saft come to the same conclusion; "Postcontract ... a franchisor can use the threat of termination to "hold up" a franchisee that has made a specific investment in the marketing arrangement. However, this potential economic power *has nothing to do with market power, ultimate consumers' welfare, or antitrust.*" Klien & Saft, *supra*, at 356 (emphasis added). The "hold up" of franchisees is a "contract problem," but not an antitrust problem. As the axiom provides, the antitrust laws were designed to protect competition, not competitors; injury to the plaintiff alone (or to the franchisees) is not sufficient to prove injury to com-

petition. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

**5.** The *Digidyne* court's failure to engage in market analysis has been rejected by the commentators and the courts. *Mozart*, 833 F.2d at 1346 n. 4. (*citing cases and articles*). The *Mozart* panel points out that two of the five Justices who favor retention of the per se rule against tying arrangements would have granted cert in *Digidyne* because of the panel's failure to engage in market analysis. *Id.*

the Pizza Man service marked products, and Dixie would cover the remaining products which El Centro could not sell (such as food products). As a result of the concerted action between El Centro and Dixie, El Centro terminated plaintiff's distributorship.

At the time of the alleged agreement between Dixie and defendant, defendant had not entered the distribution market. Moreover, Dixie and defendant are not competitors because Dixie competes in the market for non-service marked goods, and defendant competes in the market for service marked goods. Therefore, there is no possible "horizontal" concert of action. Finally, there is *no* evidence that defendant and Dixie conspired to preclude plaintiff from the distribution market. There is no evidence that the "deal" alleged by plaintiff is anything more than a hypothesis of plaintiff's attorney. El Centro had the power to preclude its franchisees from dealing with plaintiff independant of any "deal" struck with Dixie. In fact, Dixie had no power to engage in a concerted refusal to deal because, as a distributor, Dixie did not deal with plaintiff. Thus, the real question is whether El Centro violated the antitrust laws with respect to the alleged concerted refusal to deal between El Centro and its franchisees, or whether El Centro's own refusal to deal with plaintiff violated antitrust law.

### 2. *Rule of Reason for Vertical Conspiracy*

■ Plaintiff also alleges a vertical boycott between El Centro and the wholesalers of service marked supplies, and the various franchisees. El Centro sent letters to the wholesalers of approved Pizza Man products directing these companies not to sell to Tominaga. Also, letters were sent to franchisees notifying them that El Centro was the sole approved distributor for Pizza Man products.

A defendant may "rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice." *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir.1987). "Once a defendant has met this initial burden, a plaintiff *must provide specific factual support*

*for its allegations of conspiracy tending to show that the defendant was not acting independently."* *Id.*

Defendant has raised the plausible business justification of quality control as a reason for its termination of Tominaga. *Mozart*, 833 F.2d at 1352 (quality control is a legitimate business justification for conduct alleged in a conspiracy charge). Plaintiff points to no specific evidence tending to establish that El Centro was acting in concert with its franchisees or with the distributors in order to protect any of them from competition. Under these circumstances, summary judgment is appropriate. *Richards*, 810 F.2d at 903.

## IV. REFUSAL TO DEAL

■ An individual refusal to deal is analyzed under the rule of reason. *Fine v. Barry and Enright Productions*, 731 F.2d 1394, 1398–99 (9th Cir.), *cert. denied*, 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984). To establish a Section 1 violation under the rule of reason, plaintiff must show an agreement which is intended to harm or unreasonably restrain competition and *actually does so. Id.* at 1399. Plaintiff must show injury to a market or to competition in general, not merely injury to individual competitors. *Id.*

■ Defendant has introduced evidence that its entry into the distribution market had a procompetitive effect, and plaintiff has not made any showing that defendant's entry into the market and exclusion of plaintiff (for a four month period) had an anticompetitive effect. Plaintiff has simply not addressed this issue, and no evidence submitted by plaintiff shows injury to competition, as opposed to injury to a competitor. Therefore, summary judgment is appropriate.

## V. PENDENT STATE LAW CLAIMS

### A. *Unfair Competition*

■ Plaintiff claims defendants unfairly competed with defendant by inducing plaintiff to "improve, modify and change" the Pizza Man pizza crust, and then entering plaintiff's market for the sale of Pizza Man pizza crust by selling the "secret for-

mula" for the crust as developed by Tominaga.

Plaintiff's complaint alleges that plaintiff developed the present formulation and recipe for the pizza crust and passed the specifications on to El Centro. Plaintiff alleges that the recipe was secret because it could not be independently developed without substantial expense, time and research, and plaintiff was not paid for the new formula. Plaintiff claims he only disclosed the secret recipe (in confidence) for quality approval. In effect, plaintiff alleges that defendants "stole" plaintiff's pizza crust formula, which was revealed to defendants in confidence, and began selling the crust in competition with plaintiff.

The evidence reveals that the crust formula is indeed secret, in fact, it is so secret that plaintiff does not know the recipe! Tominaga Deposition, p. 138. The undisputed facts are as follows:

Pizza Man hired Pillsbury to formulate a new pizza crust. Pillsbury's recipe is a secret formula, and nobody outside that company knows the recipe (neither Tominaga nor Vance Shepherd). Tominaga thought the new crust was better than the old General Mills crust. However, he thought there was room for improvement.

Tominaga went to Jacopo's Pizzeria in West Los Angeles and discovered they used a "high-gluten" flour, and that Jacopo's was a very successful pizzeria. With this information, Tominaga told Shepherd that "we need to try out a high-gluten flour." Plaintiff "believes" Shepherd then talked to the people at Pillsbury to get them to increase the strength of their flour. Tominaga Deposition, p. 137. Tominaga also claims to have told Shepherd to "add oil ... [and] add yeast." "I told him [Shepherd] that he should work with Pillsbury to—with their chemists. I mean, I'm not a chemist. And they should improve the product in that manner."

The evidence shows that plaintiff did not develop a secret recipe based upon extensive research. Rather, he asked another pizza joint what type of crust they used, and passed this generalized information onto Shepherd, and Pillsbury may have used this in developing their crust.

There are some business formulae, compiled information, and devices or processes which, though neither copyrighted nor patented, or not even novel, are kept as "trade secrets" of the user. Any secret information used in the conduct of the plaintiff's business which is of some competitive advantage to him, and which is not disclosed to the public, might be included. Witkin, 7 *Summary of California Law*, at p. 5305. Equity provides a remedy where the information is kept secret and it is improperly obtained by the defendant. *Id.* at 5306.

In this case, plaintiff passed on generalized advice concerning the consistency of Jacopo's Pizzeria's pizza crust. This information does not constitute a trade secret. Therefore, summary judgement is appropriate.

B. *Interference with Contract and/or Prospective Advantage*

◼ Plaintiff claims that defendants interfered with plaintiff's contractual relations with El Centro's franchisees, as well as interfering with plaintiff's prospective business advantage by precluding the franchisees from purchasing service marked goods from plaintiff.

The tort of interference with prospective advantage consists of intentional and improper methods of diverting or taking business from another which are not within the privilege of fair competition. Witkin, 4 *supra*, at p. 2643. Under California law, one competitor is justified in inducing customer's of another to do business with him. The "competition justification" requires that (1) the economic relation concerns a matter involved in the competition between the actor and competitor, (2) that no improper means are employed, (3) no illegal restraint of competition is attempted or intended, and (4) at least in part the purpose is to advance competition with the other party. *Charles C. Chapman Building Co. v. California Mart*, 2 Cal.App.3d 846, 855–56, 82 Cal.Rptr. 830 (1969). The cases turn almost entirely upon the defendant's motive or purpose, and the means by which he has sought to accomplish it. *Id.* Almost any manner of intentional invasion of plaintiff's interest may be sufficient if

the purpose is not a privileged one. Thus, motive and intent are the crucial issues. *Continental Maritime v. Pacific Coast Metal Trades,* 817 F.2d 1391, 1395 (9th Cir.1987).

Once defendant produces evidence that its action was based on a legitimate business motivation, plaintiff must present some evidence tending to exclude the defendant's innocent explanation. *Continental Maritime,* 817 F.2d at 1395. Plaintiff's declaration presents evidence which casts a shadow upon defendant's "innocent explanation" that plaintiff was terminated for reasons of quality control. Plaintiff was only terminated only from the service mark products distribution business, not the non-service mark product market, which includes the food used as ingredients in Pizza Man pizza. Moreover, plaintiff's declaration states that as an individual involved in the business, he knows that it is expensive to store the perishable items used as ingredients. This suggests that defendant terminated plaintiff's business in the service marked goods business in order to gain a competitive advantage, and did not exclude plaintiff from the perishable goods market for Pizza Man ingredients because defendant could not afford to enter that market. Since quality control concerns are at least equally relevant to both markets, the evidence may lead a reasonable jury to infer defendant's actions were motivated by its desire to eliminate a competitor, not to control quality.

Since the legal question centers on defendants' motive, and plaintiff has presented evidence which a reasonable jury may find persuasive, summary judgment on this claim is not appropriate. There is a material issue of fact as to whether defendants' termination of Tominaga was improperly motivated.

### C. *Duty of Good Faith and Fair Dealing*

█ Plaintiff alleges that he had an agreement with El Centro that he would be El Centro's distributor to its franchisees and that each store was to be free to purchase from distributors of their choice, and that by terminating plaintiff's distributorship they (defendants) have violated the covenant of good faith and fair dealing.

A tort claim for breach of the implied covenant of good faith and fair dealing requires proof of a special relationship between the parties, characterized by elements of public interest, adhesion and fiduciary responsibility. *Seaman's Direct Buying Service, Inc. v. Standard Oil,* 36 Cal.3d 752, 768–69, 206 Cal.Rptr. 354, 686 P.2d 1158 (1984). In *Wallis v. Superior Court,* 160 Cal.App.3d 1109, 207 Cal.Rptr. 123 (1984), the court listed a number of factors which must be present for a "special relationship" to exist; (1) the parties are in inherently unequal bargaining positions, (2) the plaintiff's motivation for entering into the contract must be a non-profit motivation (to secure peace of mind, security and future protection), (3) plaintiff is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the defendant to perform, and (4) defendant is aware of plaintiff's vulnerability. *Id.* at 1118.

As recognized by the court in *Premier Wine & Spirits v. E. & J. Gallo Winery,* 644 F.Supp. 1431, 1436–37 (E.D.Cal.1986), the supplier-distributor relationship cannot be described as having a "non-profit" motive. Similarly, the relationship between a franchisor and a distributor can not be described as having a non-profit motive because it is purely a business relationship and plaintiff is in the business to make a profit. Therefore, it seems that plaintiff's claims is outside the scope of the tort. Summary judgment is appropriate.

The Court will retain its pendent jurisdiction over the interference with prospective advantage or contractual relations claim pursuant to *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed. 2d 218 (1966), because defendants' federal trademark claim is still pending in this Court.

IT IS THEREFORE ORDERED that defendants' motion for Summary Judgment is GRANTED as to all claims *except* plaintiff's claim for interference with prospective advantage or contractual relations.