**CINCINNATI SUB–ZERO PRODUCTS, INC., Plaintiff,**

v.

**AUGUSTINE MEDICAL, INC., et al., Defendants.**

**No. C–1–91–832.**

United States District Court, S.D. Ohio, W.D.

Feb. 26, 1992.

Todd Brian Portune, Cohen, Todd, Kite & Stanford, Cincinnati, Ohio, for plaintiff.

Timothy Seymour Black, Graydon, Head & Ritchey, Cincinnati, Ohio, for defendants.

## ORDER

HERMAN J. WEBER, District Judge.

This controversy involves two medical equipment companies battling for greater shares of the market for their medical products. Each party seeks preliminary injunctive relief preventing the other from disseminating false, misleading, inaccurate, or disparaging information to their customers.

Plaintiff Cincinnati Sub–Zero Products, Inc. (CSZ), an Ohio corporation with its principal place of business in Cincinnati, Ohio, alleges that defendants violated the Lanham Act, 15 U.S.C. § 1125; the Sherman Anti–Trust Act, 15 U.S.C. § 1; the Clayton Act, 15 U.S.C. § 14; the Magnuson–Moss Warranty Act, 15 U.S.C. § 2302; and, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961–64. CSZ also claims that defendants violated Ohio law namely, Ohio's Unfair Competition and Deceptive Trade Practices statutes, Ohio Rev.Code §§ 4165.01–04; Ohio's False Advertising statute, Ohio Rev.Code § 3715.68; and, Ohio's common law prohibition against tortious interference with contractual or business relationships.

Defendants are Augustine Medical, Inc. (Augustine Medical), a Minnesota corporation with its principal place of business in Eden Prairie, Minnesota; Cardinal Breathing Specialties, Inc. (Cardinal Breathing), a regional distributor of Augustine Medical products, whose principal place of business is in Louisville, Kentucky; Dr. Scott Augustine, M.D., Chief Executive Officer and Medical Director of Augustine Medical; and, Charles Smith, Vice President of Operations at Cardinal Breathing. Defendants maintain that this Court lacks personal jurisdiction over the individual defendants Dr. Augustine and Smith. Defendants assert three counterclaims: CSZ violated the Lanham Act; CSZ committed acts constituting unfair competition or deceptive trade practices in violation of Ohio Rev.Code § 4165.-02; and CSZ's promotion of certain products constituted false advertising in violation of Ohio Rev.Code § 3715.68.

This matter is before the Court upon the parties' requests for preliminary injunctive relief (doc. nos. 2, 6, 9, 10, 11, 35, 36). On December 5, 1991, pursuant to the record

of a preliminary conference, the Court set this matter for an evidentiary hearing, and advanced and consolidated the parties' requests for injunctive relief with a hearing on the merits of all issues, other than jury issues, pursuant to Fed.R.Civ. p. 65(a)(2). (doc. no. 4). The Court held an evidentiary hearing from December 30, 1991 to January 3, 1992. The parties have submitted proposed findings of fact and conclusions of law (doc. nos. 10, 11, 35, 36).

### Findings of Fact

CSZ distributes, manufactures, and supplies a convective air patient-warming system known as the WarmAir Hyperthermia System (the WarmAir System). Augustine Medical manufactures and sells a convective air patient-warming system known as the Bair Hugger Patient Warming System (the Bair Hugger System). Health care providers use these products to combat hypothermia and to re-warm patients following surgery. The products are most often used in post-anesthesia care units (PACUs) and intensive care units (ICUs) at hospitals. There are approximately 5,000 hospitals in the United States which contain either a PACU or an ICU. The products are not available to the general public since both require a physician's order for use.

Both warming systems contain two elements: a warming unit and a disposable warming device. The disposable device is placed near a patient and is connected to the warming unit with a flexible plastic hose. The warming unit fills the disposable device with warm air and, when covered with a sheet or blanket, each system surrounds a patient with a pocket of air that is warmer than room temperature. Both CSZ and Augustine Medical claim that their products are safe and effective methods of raising a patient's body temperature.

CSZ's disposable is a U-shaped, warming tube (the Warming Tube) that connects to a Warming Unit with a cardboard "tee." The Warming Tube rests on the bed next to a patient and partially encircles the patient from the shoulder area to the feet. When the Warming Unit fills the Warming Tube with warm air, a sheet or blanket is draped over the Warming Tube and patient to trap warm air around the patient.

Augustine Medical's disposable is a warming cover (the Warming Cover), which is blanket-like on one side and plastic on the other. The Warming Cover is designed to rest on or hover slightly above a patient lying in bed when a warming unit fills it with warm air. Like a sheet or blanket, it traps warm air around the patient.

Defendants began marketing its Bair Hugger System in 1988 and have enjoyed substantial success. Defendants' system was the first convective air patient-warming product on the market in 1988. Health care providers have used the Bair Hugger System in more than two million patient-warming therapies in PACUs and ICUs at hospitals throughout the continental United States. Nine studies, published as peer-review articles, confirm the validity of defendants' system. CSZ challenges the independence of the researchers who performed these studies. At present, defendants continue to market and sell the Bair Hugger System in the United States.

Although CSZ did not market a convective-air system in 1988, CSZ did market a patient-warming system consisting of a circulating-water mattress. Leonard Berke, CSZ's president, created the WarmAir System after learning about the Bair Hugger System. Berke testified that he created the WarmAir System in response to problems experienced by health care providers who used defendants' system.

CSZ developed its WarmAir System to be sold as a complete system containing both the Warming Unit and the disposable Warming Tube. CSZ, however, also designed the Warming Tube to be compatible with defendants' Warming Unit in order to solve or circumvent the problem of convincing health care providers to pay the high cost of replacing defendants' Warming Unit with CSZ's Warming Unit. CSZ presently markets and sells its products for use in PACU's and ICU's located in clinics and hospitals across the United States.

CSZ's disposable Warming Tube can be attached to defendants' Warming Unit. CSZ has represented to health care provid-

ers that its Warming Tube, when connected to the Bair Hugger Warming Unit, is as safe and as effective as the Bair Hugger Warming Cover. Prior to selling its WarmAir System, CSZ safety tested the use of its Warming Tube with defendants' Warming Unit. Defendants challenge the safety and efficacy of attaching any device, other than its Warming Cover, to its Warming Unit.

CSZ began marketing and selling the WarmAir System in approximately May 1991. Berke testified that during the first few months sales exceeded his expectations. Sales declined dramatically, according to CSZ, around September 30, 1991 when Augustine Medical mailed a letter to approximately 1,600 current customers (def. ex. 25). The letter, written and signed by Dr. Augustine in his capacity as Chief Executive Officer of Augustine Medical, informed Augustine Medical's customers that use of other warming devices with Augustine Medical's Warming Unit was neither safe nor effective. Dr. Augustine supported this claim with a general reference to "laboratory testing" and stated, "products that inject warm air into a transverse tube at the patient's feet subject the patient to the risk of thermal injury." *Id.* at 1. Augustine Medical also disclaimed any liability for patient injuries caused by attaching "a competitor's warming cover" to its Warming Unit. *Id.* at 2. Augustine Medical emphasized that FDA approval did not exist for use of competitors' products with its Warming Unit. Augustine Medical declared its lifetime warranty "null and void if the Warming Unit is not used with the Bair Hugger Warming Covers." *Id.*

When they sent the letter, defendants were aware of CSZ's promotional and sales activities. Both Dr. Augustine and David Neal, Augustine Medical's Director of Marketing, admitted that the letters were one part of an overall company marketing mission at Augustine Medical to market the Bair Hugger System. Augustine Medical sent some letters to health care providers with a PACU or ICU located in the Southern District of Ohio.

On or about October 15, 1991, defendant Smith, Vice President of defendant Cardinal Breathing, one of Augustine Medical's dealers, distributed to some existing customers a notice labeled "Possible Hazard Alert and Possible Loss of Product Warranty" (the Hazard Notice) (pl. exh. 7B). The Hazard Notice related to CSZ's WarmAir System. It contained warnings about a lack of FDA approval, warnings of possible warranty revocation, statements about the risk of thermal injury to patients when using competitive products, comments regarding alleged safety concerns, and statements about "unbalancing" Augustine Medical's warming system by using competitive materials. *Id.* Defendant Smith, in his capacity as Vice President of Operations at Cardinal Breathing, drafted the Hazard Notice and sent it to existing CSZ customers in the Southern District of Ohio. In preparing the Hazard Notice, Smith relied upon representations received from Augustine Medical. Smith admitted that neither he nor Cardinal conducted any tests to verify or support the statements in the Hazard Notice.

On October 28, 1991, David Neal, Augustine Medical's Director of Marketing, sent a letter to Augustine Medical's customers. In the letter Neal stated:

> **Bair Hugger Therapy takes less time to warm patients than the other designs.** Warming time is important when the therapy is started *and* when the cover is lifted for patient access.... **Bair Hugger Therapy will rewarm the patient quickly (less than five minutes)** while other designs take up to 30 minutes to regain their operating temperature....

(pl. ex. A) (emphasis added to statement concerning rewarming in less than five minutes; other emphasis in original).

Dr. Augustine testified that Neal's statement regarding Bair Huggers' ability to rewarm patients in less five minutes was never retracted, even though it is inaccurate. Dr. Augustine stated that Neal should have referred to the air around the patient, rather than the patient alone. Dr. Augustine characterized the inaccuracy as a typographic error.

Defendants also disseminated information about its Bair Hugger System in several advertisements including a colored promotional brochure, a sign used at trade shows, and a videotape entitled "The Cost of Cold." These advertisements were part of defendants' overall mission to market the Bair Hugger System.

The brochures and the videotape contain thermographic images demonstrating the heat flow characteristics of various patient-warming systems. *See, e.g.,* pl. exh. 2. A thermographic image portrays the surface temperatures of an object by matching a temperature with a particular color. The resulting image contains an outline of the object. Within the outline, color variations detail any change in the object's surface temperature. The viewer matches a particular color with a key that indicates the temperature represented by the color. *See id.*

Augustine Medical conducted thermographic tests of their Warming Cover and the CSZ's Warming Tube. When conducting these tests, the tester failed to use the products in a manner consistent with their designated use. For example, the tester took the thermographic images with the Warming Tube in a vertical rather than a horizontal position. The tester also did not place a sheet or blanket over the system during testing. Defendants did not provide evidence indicating that the thermograms used in their advertisements accurately portrayed a patient's core temperature; rather the evidence established that the thermograms portrayed the surface temperature of the cover or blanket, if any, over the patient.

Augustine Medical used thermographic images in its brochures and in the video tape in an attempt to demonstrate that its patient-warming system out-performs its competitors' systems. Augustine Medical produced approximately 6,000 videotapes and distributed them in two mass mailings; first, to all current Augustine Medical customers; second, to all other hospitals with a PACU or ICU after November 19, 1991. A total of approximately 5,000 videotapes

were mailed. Augustine Medical still possesses the remaining videotapes.

## OPINION

### I. *Personal Jurisdiction*

The individual defendants, Dr. Augustine and Charles Smith, argue that this Court lacks personal jurisdiction over them, because neither has any personal contact with this forum. These defendants argue, relying primarily on *Weller v. Cromwell Oil Co.,* 504 F.2d 927 (6th Cir.1974), that this Court lacks personal jurisdiction over them because the corporate shield doctrine protects them from personal liability for actions they took on behalf of the corporation.

■ CSZ has the burden of alleging facts that demonstrate the existence of personal jurisdiction over the individual defendants. *See American Greetings Corp. v. Cohn,* 839 F.2d 1164, 1168 (6th Cir.1988); *Weller,* 504 F.2d at 929.

■ A federal court sitting in diversity looks to the law of the forum state to determine whether personal jurisdiction exists over a non-resident defendant. *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Determination of whether the district court has personal jurisdiction over a defendant must, therefore, be resolved by applying Ohio's long-arm statute. Ohio Rev.Code § 2307.-382. *American Greetings,* 839 F.2d at 1167.

Ohio's long-arm statute provides in pertinent part:

(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

(1) Transacting any business in this state;

(2) Contracting to supply services or goods in this state;

(3) Causing tortious injury in this state by an act or omission outside this state if he regularly does business, or engages in any other persistent course of conduct, or derives substantial revenue

from goods used or consumed or services rendered in this state. . . .

Ohio Rev.Code § 2307.382.

■ Personal jurisdiction exists if: 1) The individual defendants' conduct satisfies one of the specific provisions of Ohio's long-arm statute; 2) The application of Ohio's long-arm statute to the individual defendants does not offend the notions of fair play contained in the Due Process Clause of the fourteenth amendment. *See American Greetings Corp.*, 839 F.2d at 1166–67; *Wright Intern. Exp., Inc. v. Roger Dean Chevrolet*, 689 F.Supp. 788, 790 (S.D.Ohio 1988).

■ Ohio's long-arm statute extends personal jurisdiction over non-resident defendants within the limits permitted by the Due Process Clause. *Welsh v. Gibbs*, 631 F.2d 436, 439 (6th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1517, 67 L.Ed.2d 816 (1981); *Wright International*, 689 F.Supp. at 790. The question of whether Ohio's long-arm statute extends to the individual defendants, therefore, merges into a single question: Whether the exercise of personal jurisdiction over these defendants comports with the due process clause? *Wright International*, 689 F.Supp. at 790 (citations omitted).

■ In the Sixth Circuit, the following three-part analysis determines whether the exercise of personal jurisdiction comports with due process:

1) Did the individual defendants purposely avail themselves of the privilege of acting in Ohio or causing a consequence in Ohio? 2) Did the cause of action arise from defendants' acts in Ohio? 3) Did defendants' acts have a sufficiently substantial connection with Ohio to make the exercise of jurisdiction over them reasonable?

*See Nat'l Can Corp. v. K Beverage Co.*, 674 F.2d 1134, 1137–38 (6th Cir.1982) (citing *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

■ Where an interstate contract is at issue, a defendant purposely avails himself of the privilege of acting in the forum state when he reaches into the forum state to create an ongoing relationship with continuous obligations that are enforceable under the law of the forum state. *LAK, Inc. v. Deer Creek Enterprises*, 885 F.2d 1293, 1300 (6th Cir.1989), *cert. denied*, 494 U.S. 1056, 110 S.Ct. 1525, 108 L.Ed.2d 764 (1990).

■ Personal jurisdiction over a corporate officer in his or her individual capacity cannot be based solely on the propriety of the district court's exercise of jurisdiction over the corporation. *Weller*, 504 F.2d at 929.

■ CSZ has not established that Dr. Augustine and Smith purposely availed themselves in their individual capacities of the privilege of acting in Ohio. This is so because CSZ fails to point to any evidence indicating that either Dr. Augustine or Smith acted in their individual capacity when they signed and sent correspondences into Ohio. Examination of the correspondences reveals that the individual defendants acted as corporate officers: The letter of September 30, 1991 was mailed under the Augustine Medical letterhead, and Dr. Augustine signed it as Chief Executive Officer (def. ex. 25); the Hazard Notice was sent under the letterhead of Cardinal Breathing Specialties, Inc., and Smith signed it as Vice President of Operations (Pl. ex. 7B).

Defendants' reliance on *Weller* is well placed. The plaintiff in *Weller* failed to meet his burden of establishing personal jurisdiction over the corporate officers in their individual capacities, because "the activities of the officers in behalf of the corporate defendants did not confer jurisdiction over the individuals." 504 F.2d at 931. In the instant case, Dr. Augustine and Smith's correspondences affirmatively indicate they were acting in their corporate capacities by containing corporate letterheads and titles. Their correspondences in no way indicate that they were acting in anything but their corporate capacities. *Cf. id.* at 928–31.

Accordingly, this Court finds that CSZ has failed to meet its burden of producing

evidence to support this Court's exercise of personal jurisdiction over the individual defendants Dr. Augustine and Charles Smith. The Court notes that the counterclaims of these individual defendants have been dismissed at their request.

Defendants further requests this Court not to exercise jurisdiction over CSZ's RICO claim at least until CSZ establishes that the claim is not frivolous and is properly venued. Defendants' request is denied at this time because this Court has jurisdiction over CSZ's RICO claim, 18 U.S.C. § 1964(a), and because it appears that venue of the RICO claim is proper in this district, 18 U.S.C. § 1965.

## II. *Collateral Estoppel*

Defendants [1] argue that it would be inappropriate for this Court to reach any ultimate decision on the merits of CSZ's claims prior to a jury determination of the validity of CSZ's monetary claims. Defendants emphasize that they are entitled to a jury trial on all of CSZ's claims for monetary relief. Defendants reason that a jury should make its determinations prior to this Court making equitable findings, since defendants are entitled to have a jury resolve all issues on CSZ's equitable claims that are common to CSZ's legal claims, and since factual issues exist that are common to all of CSZ's monetary claims.

█ Defendants' reasoning and conclusion lack merit. Defendants' conclusion lacks merit because in the Order setting the hearing on CSZ's motion for preliminary injunction (doc. no. 4), this Court informed the parties that the hearing would involve "all issues ... other than jury issues ..." *Id.* Since all of the parties' claims involve jury issues, and since it is generally inappropriate for a district court to enter final judgement on the merits of a claim at the preliminary injunction stage, *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981), this Court will not issue a *final* judgement on the validity of the claims when ruling on the parties' requests

for preliminary injunction. *Cf. William G. Wilcox, D.O., P.C. Emp. Pen., Tr. v. U.S.,* 888 F.2d 1111, 1113–14 (6th Cir.1989) (Per Curiam); *Eli Lilly & Co. v. Generix Drug Sales, Inc.,* 460 F.2d 1096, 1106–08 (5th Cir.1972).

Defendants' reasoning is unpersuasive, because it rests mainly on their attempt to expand the reasoning in *Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990) to the instant case. The plaintiff in *Lytle* brought legal claims under 42 U.S.C. § 1981 as well as equitable claims under Title VII. The District Court erred in dismissing the plaintiff's legal claims. The issue resolved in the negative in *Lytle* was whether the doctrine of equitable estoppel precluded relitigation of the identical issues to a jury that the District Court previously resolved when ruling on the plaintiff's equitable claims. *Id.* at 549–54, 110 S.Ct. at 1335–38.

Application of *Lytle* to the instant case in the manner requested by defendants is unwarranted because this Court in ruling on the requests for a preliminary injunction will not, as defendants' reliance on *Lytle* suggests, create a situation where the doctrine of collateral estoppel operates to bar a jury from considering the validity of CSZ's claims for monetary relief. *Cf. Lytle,* 494 U.S. at 549–54, 110 S.Ct. at 1335–38 (analyzing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)); *cf. also William G. Wilcox, D.O., P.C. Emp. Pen., Tr.,* 888 F.2d at 1113–14; *Eli Lilly & Co.,* 460 F.2d at 1106–08.

Accordingly, contrary to defendants' contention, it is appropriate for this Court to consider the parties' requests for preliminary injunction.

## III. *The Parties' Requests and Preliminary Injunction Law*

CSZ seeks a preliminary injunction that restrains and enjoins defendants from publishing or disseminating statements about CSZ's products which are untrue, false,

---

1. The term "defendants" refers to the corporate defendants, Augustine Medical and Cardinal

Breathing, from this point forward.

misleading, disparaging, or otherwise injurious to CSZ's business. CSZ also seeks an injunction ordering defendants to retract the allegedly false statements it previously made.

Defendants seek a preliminary injunction prohibiting CSZ from claiming that its Warming Tube can be combined safely and effectively with the Augustine Medical's Bair Hugger Warming Unit.

"[T]he purpose of a preliminary injunction, in contrast to one that is final, 'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Southern Milk Sales, Inc. v. Martin,* 924 F.2d 98, 102 (6th Cir.1991) (quoting *Camenisch,* 451 U.S. at 395, 101 S.Ct. at 1834).

In determining whether to issue or withhold a preliminary injunction, this Court must balance the following factors:

(1) Whether the party seeking the injunction has shown a substantial likelihood of success on the merits;

(2) Whether the party seeking the injunction will suffer irreparable harm absent the injunction;

(3) Whether an injunction will cause others to suffer substantial harm; and

(4) Whether the public interest would be served by a preliminary injunction.

*Southern Milk Sales, Inc.,* 924 F.2d at 103 n. 3; *Newsom v. Norris,* 888 F.2d 371, 373 (6th Cir.1989); *Frisch's Restaurant, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1263 (6th Cir.1985).

■ A party must show more than a mere possibility of success to obtain a preliminary injunction. *Michigan Coalition v. Griepentrog,* 945 F.2d 150, 153 (6th Cir. 1991). In general, the extent a party must demonstrate a substantial likelihood of success varies inversely with the degree of harm the party will suffer absent an injunction. *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 538 (6th Cir.1978), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979). Issuance of a preliminary injunction is appropriate "where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to defendant if an injunction is issued." *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985) (citation omitted).

■ Although no single factor is determinative of the availability of a preliminary injunction, *In re DeLorean,* 755 F.2d at 1229, a failure to demonstrate the existence of an irreparable injury absent a preliminary injunction can be fatal to a motion for preliminary injunction. *See, e.g., Southern Milk Sales, Inc.,* 924 F.2d at 103.

■ At the preliminary injunction stage, a district court is not required to resolve "doubtful or difficult questions of law or disputed questions of fact." *International Molders' and Allied Workers' Local U. v. Nelson,* 799 F.2d 547, 551 (9th Cir.1986).

### IV. *The Lanham Act and Ohio Law*

The Lanham Act provides in pertinent part:

> Any person who, on or in connection with any goods or services ..., uses in commerce any word ..., or any ..., false or misleading description of fact, or false or misleading representation of fact, which:
>
> \*     \*     \*     \*     \*     \*
>
> (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities ..., of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

The analysis applicable to the parties' claims under Ohio's Deceptive Trade Practices and False Advertising statutes is the same analysis applicable to their claims under the Lanham Act. *See Worthington Foods, Inc. v. Kellogg Co.,* 732 F.Supp. 1417, 1431 (S.D.Ohio 1990); *see also Jewell Cos., Inc. v. Westhall Co.,* 413 F.Supp. 994, 999 (N.D.Ohio 1976), *aff'd,* 575 F.2d 1176 (6th Cir.1978); *Cesare v. Work,* 36 Ohio

App.3d 26, 28, 520 N.E.2d 586 (1987); *Diamond Co. v. Gentry Acquisition Corp.,* 48 Ohio Misc.2d 1, 5, 531 N.E.2d 777 (1988). This Court will therefore analyze, under the same criteria, the parties' requests for injunctive relief based on the alleged violations of the Lanham Act and Ohio statutory law.

### A. Substantial Likelihood of Success on the Merits

CSZ contends that it has demonstrated a substantial likelihood of success on it claim under the Lanham Act, 15 U.S.C. § 1125(a)(2), and Ohio's False Advertising and Deceptive Trade Practices statutes[2], since it has presented evidence of defendants' various false and misleading statements in correspondences, advertisements, brochures, journal articles, and the "Cost of Cold" videotape. In response to defendants' counterclaims, CSZ maintains that the information it disseminated was true.

Defendants contend that they have established a substantial likelihood of success on their counterclaim under the Lanham Act because the evidence establishes the falsity of CSZ's representations concerning the compatibility of its Warming Tube with the Bair Hugger Warming Unit. In response to CSZ's claims, defendants maintain that the information it disseminated was true.

■■■■■ In order to obtain an injunction for an alleged violation of the Lanham Act, a party must show a substantial likelihood of success in proving that the challenged representation is false or misleading, that it was made "in commerce," and that it is "material." *U.S. Healthcare v. Blue Cross of Gr. Philadelphia,* 898 F.2d 914, 922 (3d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990); *see also Coca-Cola Co. v. Procter & Gamble Co.,* 822 F.2d 28 (6th Cir.1987); *Janda v. Riley-Meggs Industries, Inc.,* 764 F.Supp. 1223, 1228 (E.D.Mich.1991). "Mere puffing, advertising that is not deceptive for no one would rely on its exaggerated claims, is not actionable ..." under the Lanham Act. *U.S. Healthcare,* 898 F.2d at 922. A mis-

representation is "material" within the meaning of the Lanham Act if it is "likely to influence the purchasing decision...." *Id.,* or if it misrepresented an "inherent quality or characteristic of the ... product." *Nat'l Ass'n of Pharmaceutical Mfrs. v. Ayerst Lab.,* 850 F.2d 904, 917 (2d Cir.1988) (citation omitted). There is no requirement in the Lanham Act that a person intentionally or willfully mislead the public. *Id.* Proof of actual injury is not required under the Lanham Act. *Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197, 210 (9th Cir.1989); *Johnson & Johnson v. Carter-Wallace, Inc.,* 631 F.2d 186, 191–92 (2d Cir.1980).

■■■■ CSZ has shown a substantial likelihood of success on its challenge to Augustine Medical's letter of October 28, 1991. Dr. Augustine admitted that the letter of October 28, 1991 was inaccurate to the extent it stated that the Bair Hugger System's could rewarm patients in less than five minutes. *Supra,* p. 1553. This misrepresentation, made in commerce, was "material" because it concerned an essential characteristic of the Bair Hugger System (its ability to quickly rewarm patient), and because such a representation would likely induce health care providers to purchase Bair Hugger Systems. *See U.S. Healthcare,* 898 F.2d at 922.

CSZ has also shown a substantial likelihood of success on its challenge to Augustine Medical's use of thermographic images in its brochures and video-tape advertisements. Augustine Medical's use of thermograms in advertisements misrepresents or misleads health care providers, because the thermograms do not accurately portray the Bair Hugger System's ability to combat hypothermia. Rather than portraying a patient's core temperature—the vital temperature used in diagnosing hypothermia—the thermograms portray the surface temperature of the sheet or blanket which covers the patient. This misrepresentation is material, because it concerns an inherent quality or characteristic of the Bair Hugger system (the ability to rewarm a patient).

**2.** Ohio Rev.Code §§ 3715.68, 4165.02.

The message, moreover, is material because it is likely to influence health care providers to purchase the Bair Hugger System. Dr. Augustine illustrated this when he described the power of a thermogram to convey an advertising concept in the noteworthy (if somewhat pedestrian) phrase, "A picture is worth a thousand words."

Accordingly, CSZ has established a substantial likelihood of success on its challenge under the Lanham Act to defendants' use of thermograms in promoting the Bair Hugger System.

■ Defendants have demonstrated a substantial likelihood of success on their Lanham Act claim, because the evidence establishes that CSZ has not fully tested or verified its claims of "equal safety." Specifically, CSZ has not fully safety-tested for the possibility of injury to a patient if his or her foot rested on the cardboard "tee" that connects CSZ's Warming Tube to a Warming Unit. The evidence shows that CSZ did not consider the potential danger of a patient's foot being burned by the combination of temperature and pressure at the cardboard "tee." Although the evidence also shows that CSZ tested its WarmAir System for many months including safety tests of the Warming Tube when attached to the Bair Hugger Warming Unit, the absence of tests for the potential danger of burns to a patient's feet leaves CSZ's claim of equal safety neither adequately tested nor fully verified. Since CSZ did not fully verify its equal-safety claim, the claim constitutes a misrepresentation or a misleading statement. The equal safety claim is material because it misrepresents an inherent characteristic of CSZ's product and because it is likely to induce health care providers to purchase the WarmAir System. See U.S. Healthcare, 898 F.2d at 922.

Accordingly, defendants have established a substantial likelihood of success on its challenge under the Lanham Act to CSZ's equal-safety claim.

Turning to the remaining evidence, the vast majority of the parties' product-testing evidence fails to establish that either party will be able, substantially, to prove that their products are more safe and effective than the others, or that the opposing party's products are unsafe and ineffective. This is so because the evidence reveals that the parties' product tests were non-objective, unscientific, result-oriented experiments. Although this evidence may, upon a jury's resolution of the credibility issues at trial, be sufficient to establish by a preponderance of the evidence that CSZ, or defendants, or both, violated either the Lanham Act or Ohio's consumer protection statutes, the parties' product-testing evidence fails to satisfy the "substantial likelihood of success" test necessary to support the issuance of a preliminary injunction. See Newsom, 888 F.2d at 373; Frisch's Restaurant, Inc., 759 F.2d at 1263; cf. Nelson, 799 F.2d 547 (A district court is not required to resolve factual disputes when ruling on motion for preliminary injunction.).

This Court finds, however, that given the unscientific, result-oriented nature of the parties' product-testing evidence, both parties have shown a substantial likelihood of succeeding on the merits of their claims under the Lanham Act in regard to any disparaging statements, advertisements, or representations either party has made or may make in the future concerning the other parties' products. Such representations are substantially likely to violate the Lanham Act or Ohio's consumer protection statutes because the absence of scientifically valid data renders disparaging remarks materially misleading or false.

Accordingly, CSZ has sustained its burden of showing a substantial likelihood of success under the Lanham Act and under Ohio's Deceptive Trade Practices and False Advertising statutes on its challenges to Augustine Medical's letter of October 28, 1991, and the thermograms in Augustine Medical's brochures and video tape. Defendants have sustained their burden of showing a substantial likelihood of success under the Lanham Act and under Ohio's false advertising statute on their challenge to the CSZ's claim of "equal safety." Both parties have established any disparaging advertisement, statement, or representa-

tion concerning the others' products is substantially likely to violate the Lanham Act.

### B. Irreparable Injury

CSZ argues that it has suffered irreparable injury as a result of defendants' conduct, because CSZ has lost a unique opportunity to enter the convective air patient-warming market, and because defendants have damaged CSZ's business reputation in an undeterminable amount. CSZ contends that the issuance of a compensatory damages award in their favor would not be as efficient, as effective, as prompt, or as certain a remedy as a preliminary injunction.

Defendants' argue that given the testimony of CSZ's President Berke and CSZ's Sales Director Russell Pennevaria, this Court cannot conclude that any harm sustained by CSZ is irreparable, since both Berke and Pennevaria testified that by the time of trial, CSZ would be able to identify and attach a dollar value to each injury it allegedly suffered. Since, according to defendants, CSZ's potential injuries can be remedied at law, equitable relief is not required.

As to its counterclaims, defendants argue that they will suffer irreparable injury because, in the event CSZ's patient-warming system injures a patient, CSZ's claims of equal safety and efficacy will devastate Augustine Medical's business and will taint the attitudes of health care providers toward convective-air therapy. Defendants further contend that any patient injury caused by the combined use of CSZ's components and Augustine Medical's components would almost certainly subject defendants to litigation.

To analyze whether either party has shown they will suffer irreparable harm absent a preliminary injunction, the focal point is the term "irreparable." *Griepentrog*, 945 F.2d at 154.

Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of stay[3],

are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974)). "[T]he harm alleged must be both certain and immediate, rather than speculative or theoretical." *Id.* Each party must produce "some evidence" of both a past injury and the likelihood of future injury in order to support their claim of irreparable harm. *Id.*

The evidence presented by both CSZ and defendants in support of their claims of false or misleading representations constitutes some evidence in support of the conclusion that both CSZ and defendants have suffered past harm and, absent an injunction, are likely to suffer future harm that is both certain and immediate. This harm exists in the damage each has suffered and will suffer, absent an injunction, to their business reputation due to the allegedly false, misleading, or disparaging statements of the other. *See Winn Oil Co. v. American Way Service Corp. II*, 943 F.2d 595, 607–08 (6th Cir.1991) (and cases cited therein); *see also Janda*, 764 F.Supp. at 1229 (presuming irreparable harm when Lanham Act violated).

Defendants' contention concerning CSZ's ability to establish compensatory damages at trial lacks merit, since the future ability to calculate compensatory damages does not automatically preclude CSZ from showing irreparable harm; rather, it is simply a factor to consider when analyzing the existence of irreparable harm. *See Griepentrog*, 945 F.2d at 154. Although the existence at trial of a determinable amount of compensatory damages weighs heavily against a finding of irreparable harm, *id.*, this Court finds that the damage to CSZ's business reputation absent an injunction outweighs CSZ's professed future ability to calculate compensatory damages.

---

**3.** This reference to a "stay," rather than a preliminary injunction, has no impact on the validity of this definition of "irreparable harm" since the factors are the same for determining whether an injunction or a stay should issue. *Griepentrog*, 945 F.2d at 153, 155.

Accordingly, both CSZ and defendants have established the existence of irreparable injury absent preliminary injunctive relief.

## C. Harm to Others and Public Policy

CSZ contends that defendants will not suffer substantial harm as a result of the issuance of a preliminary injunction, since defendants will still be able to promote, market, distribute, and sell their product. CSZ argues that the public interest will be served by the issuance of an injunction since it would facilitate the creation of a competitive and fair market place.

Defendants argue that since an injunction would silence them, CSZ would be free to make its claims regarding equal safety and efficacy without refutation. Defendants' silence would imply that they concurred in the "mixing and matching of products....", and "would deny consumers the information required to make decisions consistent with patient safety." (doc. no. 36, p. 21). Defendants maintain that enjoining CSZ from making its claims of equal safety and efficacy will serve the public interest.

The Court must consider whether issuing a preliminary injunction would harm the party enjoined or others, and if so, whether such harm outweighs the irreparable harm established by the party seeking the injunction. *In re DeLorean Motor Co.*, 755 F.2d at 1229. Where harm to others exists in the presence of an injunction, the party seeking the injunction must justify its issuance by making a stronger showing on the other factors. *Frisch's Restaurant, Inc.*, 759 F.2d at 1270; *Worthington Foods, Inc.*, 732 F.Supp. at 1461.

The Court must also consider the impact an injunction will have on the public. Where an injunction will spell public ruin or disaster, the Court may refuse to issue it, even where a strong shown has been made on the other factors. *Worthington Foods, Inc.*, 732 F.Supp. at 1463. When the public will benefit greatly from an injunction—for example, when the Court enjoins an illegal activity—the Court should not hesitate to issue an injunction. *Id.*

Neither CSZ nor defendants have presented arguments or evidence showing that harm to others will occur if this Court issues a narrowly tailored preliminary injunction preventing the parties from making false, misleading, or disparaging representations to health care providers concerning the others' patient-warming system. Such an injunction will not harm the parties or others, will not unfairly inhibit the parties from marketing and selling their products to health care providers, will not silence defendants in favor of CSZ, and will not be likely to expose either to future litigation by injured patients. Enjoining misrepresentations leaves the parties free to market their products based on data they may accumulate in the future from scientific, objective experiments that are non-result oriented.

The public will benefit greatly from issuing a narrowly tailored preliminary injunction to the parties since such an injunction will protect patients and health care providers from any parties' false, misleading, or disparaging representations, and will facilitate the creation of a competitive and fair marketplace. A narrowly tailored preliminary injunction will not spell public ruin.

Accordingly, the parties have not shown that issuance of a preliminary injunction will harm others. The parties have established that a preliminary injunction will benefit the public.

## D. Conclusions

Balancing the four preliminary-injunction factors, this Court concludes that CSZ is entitled to a preliminary injunction because: it has demonstrated a substantial likelihood of success on its claims under the Lanham Act and under Ohio's consumer protection statutes; it will suffer irreparable injury absent a preliminary injunction; no harm will occur to defendants or to others by the existence of a narrowly drawn preliminary injunction; the public will greatly benefit by specifically enjoining defendants. This Court further finds that CSZ is not entitled to a preliminary injunction on its remaining allegations un-

der the Lanham Act or Ohio's consumer protection statutes.

Balancing the four preliminary-injunction factors, this Court concludes that defendants Augustine Medical and Cardinal Breathing are entitled to a preliminary injunction because: they have demonstrated a substantial likelihood of success on their claims under the Lanham Act and under Ohio's consumer protection statutes; they will suffer irreparable injury absent preliminary injunction; no harm will occur to CSZ or to others by the existence of a narrowly tailored preliminary injunction; and, the public will benefit greatly by specifically enjoining CSZ. This Court further finds that defendants Augustine Medical and Cardinal Breathing are not entitled to a preliminary injunction on their remaining allegations under the Lanham or Ohio's consumer protection statutes.

### IV. *CSZ's Anti–Trust Claims*

CSZ contends that Augustine Medical has violated the Sherman Anti–Trust Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. § 14 by attempting to create a "tying" agreement by means of making the warranty and the guarantee on its Bair Hugger Warming Unit (the tying product) available only to those persons who purchase and use its disposable Warming Cover (the tied product).

Defendants argue that the risk of injury to patients justifies advising hospitals of their potential liability for the use of the Bair Hugger Warming Unit with a product other than the Bair Hugger Warming Cover. This is especially true, according to defendants, in light of Dr. Sessler's testimony that an injury resulting from "mixing and matching" would constitute malpractice. Defendants contend that they would be remiss—and potentially liable—if they failed to warn the public of harm which could result from the misuse of its Warming Unit.

■ To obtain a preliminary injunction on its anti-trust claims, CSZ must establish that there is a substantial likelihood it will successfully demonstrate the three elements of an illegal tying arrangement: (1) the forced purchase of one commodity in order to obtain a separate desired commodity or service; (2) possession by the seller of sufficient economic power with respect to the tying product to restrain free competition in the market for the tied product; and, (3) a not insubstantial amount of interstate commerce in the tied product is affected. *United States v. Loew's, Inc.,* 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962); *Mozart Co. v. Mercedes–Benz of North America, Inc.,* 833 F.2d 1342, 1345 (9th Cir.1987), *cert. denied,* 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988); *A.I. Root Co. v. Computer/Dynamics, Inc.,* 806 F.2d 673, 675 (6th Cir.1986); *Bell v. Cherokee Aviation Corp.,* 660 F.2d 1123, 1126–27 (6th Cir.1981). When a plaintiff proves these elements, a per se illegal tying arrangement exists. *Mozart Co.,* 833 F.2d at 1345; *Bell,* 660 F.2d at 1127.

The first element of a tying arrangement, "requires proof that the second (or tied) item is forced upon the buyer as a condition of the 'original' sale ..." *White & White, Inc. v. American Hosp. Supply Corp.,* 723 F.2d 495, 506 (6th Cir.1983) (citation omitted); *see also A.I. Root Co.,* 806 F.2d at 677.

■ One method a defendant may employ to legitimize a per se illegal tying arrangement is to demonstrate a business justification for the tying arrangement. *Mozart Co.,* 833 F.2d at 1348–49.

■ CSZ has not proven a substantial likelihood of success on its federal antitrust claims because it has failed to present evidence supporting more than a mere possibility of success in showing each element of an illegal tying arrangement. CSZ has not shown that, at the time of the original sales, defendants required health care providers to purchase its Warming Blanket when purchasing the Bair Hugger Warming Unit. *See A.I. Root Co.,* 806 F.2d at 677. Instead, CSZ alleges, and the evidence at this point in the litigation tends to show, that defendants' illegal acts (attempting to prevent health care providers from attaching any other disposable warming product to the Bair Hugger Warming Unit) occurred prospectively—after the

original sales of the Bair Hugger System. *See id.* CSZ has therefore failed to establish a substantial likelihood of success in showing the first element of a tying arrangement.

The evidence is insufficient to show more than a mere possibility that defendants possess sufficient economic power with respect to the tying product to restrain free competition in the market for the tied product. The evidence is also insufficient to establish more than a mere possibility that defendants forced health care providers to purchase one commodity in order to obtain a *separate* desired commodity. *See Loew's, Inc.,* 371 U.S. at 45, 83 S.Ct. at 102; *Mozart Co.,* 833 F.2d at 1345; *A.I. Root Co.,* 806 F.2d at 675.

CSZ has not presented evidence to support the conclusion that it will suffer a substantial irreparable *anti-trust* injury in the absence of an injunction. To establish an anti-trust injury, CSZ must show evidence of an anti-competitive effect of the alleged tying arrangement. *See HyPoint Technology, Inc. v. Hewlett–Packard Co.,* 949 F.2d 874, 877 (6th Cir.1991), *petition for cert. filed,* —— U.S. ——, 112 S.Ct. 1480, 117 L.Ed.2d 623 (1992). CSZ has not pointed to evidence of a more general anti-competitive effect of the tying arrangement; rather, it improperly relies on the evidence that tends to show a decline in its business following Augustine Medical's alleged anti-trust violations.[4] *Cf. id.*

CSZ has not presented evidence demonstrating either that others will suffer substantial harm absent a preliminary injunction or that the public will be harmed or benefited by a preliminary injunction.

Accordingly, none of the four preliminary injunction factors favors issuing a preliminary injunction based on CSZ's federal anti-trust claims.

## V. *CSZ's REMAINING CLAIMS*

CSZ argues that defendants' conduct in disseminating the various statements, advertisements, brochures, journal articles,

letters, videotapes, and other correspondence constitutes common law unfair competition, and tortious interference with CSZ's current or expected business relationships.

Given this Court's analysis and findings in regard to the parties' requests for preliminary injunctive relief under the Lanham Act, and since any injunctive relief CSZ may be entitled to under its common law claims is within the scope of the preliminary injunction this Court will issue, it is unnecessary to resolve CSZ's common-law claims.

## ORDER

The Court hereby ORDERS that defendants Dr. Augustine and Charles Smith are DISMISSED without prejudice in their individual capacities and their counterclaims against CSZ are DISMISSED without prejudice.

The Court ORDERS that CSZ's motion for a preliminary injunction (doc. nos. 2, 9) is GRANTED in part and DENIED in part. The Court ORDERS defendants Augustine Medical, Cardinal Breathing, their shareholders, employees, agents, attorneys, officers, directors, assigns, and any other person acting at their direction or supervision or acting in concert with them, to comply with this preliminary injunction—until further notice of this Court—as follows:

(1) Defendants will retract the statement in their letter of October 28, 1991, regarding the Bair Hugger System's ability to rewarm a patient in less than five minutes.

(2) Defendants will not use, represent, or in any way portray thermograms in their video tapes, promotional brochures, advertisements, signs, or sales literature, or in the oral promotion of its Bair Hugger System.

(3) Defendants will not in any way disparage CSZ's WarmAir System while promoting, selling, or marketing the Bair Hugger System, or any component thereof.

---

4. The lack of an anti-trust injury also raises the specter of a standing problem with regard to CSZ's anti-trust claims. *See HyPoint Technology,* 949 F.2d at 877–78. Since the parties have yet to consider this issue, any standing analysis at this point in the litigation would be premature.

(4) CSZ's remaining requests for injunctive relief are DENIED at this time.

The Court ORDERS that defendants' request for a preliminary injunction on their counterclaims (doc. nos. 6, 36) is GRANTED in part and DENIED in part. The Court ORDERS plaintiff CSZ, its shareholders, employees, agents, attorneys, officers, directors, assigns, and any other person acting at CSZ's direction or supervision or acting in concert with CSZ, to comply with this preliminary injunction—until further notice by this Court—as follows:

(1) CSZ will not make further claims that its WarmAir System, or any component thereof, is equally safe as the Bair Hugger System or that its Warming Tube is safe and effective when attached to defendants' Bair Hugger Warming Unit.

(2) CSZ will not in any way disparage defendants' Bair Hugger System while promoting, selling, or marketing its WarmAir System, or any component thereof.

(3) Defendants' remaining requests for injunctive relief are DENIED at this time.

Pursuant to Fed.R.Civ.P. 65(c), the Court ORDERS each party to post a bond in the amount of $10,000.00 to protect the other party from such costs and damages as may be incurred or suffered in the event of wrongful injunction. As both parties prevailed, each party will bear its own costs at this time.

IT IS SO ORDERED.