**DETROIT MEDICAL CENTER,**
**a Michigan non-profit**
**corporation, Plaintiff,**

v.

**GEAC COMPUTER SYSTEMS, INC., a**
**Georgia Corporation, Defendant.**

**No. 00–CV–71606–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

June 29, 2000.

---

### OPINION

DUGGAN, District Judge.

On March 24, 2000, Plaintiff filed a "Complaint for Declaratory, Injunctive and Other Relief" against Defendant in the Wayne County Circuit Court, asking the court to declare the rights and liabilities of the parties with respect to a "License and Maintenance Agreement" that provides for Plaintiff's use of a computer inventory system developed by Defendant. On the same day, the Honorable Louis F. Simmons, Jr., issued a temporary restraining order against Defendant, prohibiting Defendant from terminating or suspending its operations, maintenance, technical support, and other contractual obligations under the Agreement.

On April 3, 2000, Defendant removed the action to this Court on diversity grounds. This matter is currently before the Court on Plaintiff's motion for a preliminary injunction.[1] A hearing regarding Plaintiff's motion was held on June 15, 2000. For the following reasons, Plaintiff's motion for a preliminary injunction shall be granted.

**1.** At a status conference on May 5, 2000, Defendant agreed not to terminate or suspend its operations or maintenance of Plaintiff's software pending resolution of Plaintiff's motion for a preliminary injunction.

### Background

#### 1. The Agreement

Plaintiff operates seven hospitals, two nursing centers, and more than one hundred outpatient facilities throughout southeastern Michigan. Since 1991, Plaintiff and Defendant have been parties to a License and Maintenance Agreement, under which Defendant granted Plaintiff a non-exclusive, non-transferrable license to use a computerized inventory system ("the System") developed by Defendant.[2]

The System provided by Defendant allows Plaintiff to maintain a "stockless inventory" system, under which only a few days worth of supplies are stocked at a time. The System also administers various financial functions, such as accounts payable, purchasing, and general ledger functions. According to Defendant, "[its] ownership of the System provides [it] with advantages over its competitors." (Def.'s Br. Opp'n at 4). To preserve this advantage, "[Defendant] goes to great lengths to preserve the confidentiality of the System by, among other things, securing confidentiality agreements from its licensees." (*Id.*). For example, the most recent Agreement between the parties states, in pertinent part:

> 4. USE. ... As used herein, 'Customer' means the specific legal entity or operating unit that has executed this Agreement.... Customer shall not assign, sublease, extend or transfer its rights under this Agreement by operation of law or otherwise.

> \*    \*    \*    \*    \*    \*

> 7. CONFIDENTIALITY. Customer shall not disclose, provide, or otherwise make available to any third party, in whole or in part, the System(s) or any information relating thereto, this Agreement, or any confidential material of

**2.** The System includes both source and object computer code developed by Defendant.

[GEAC] except in confidence to employees of Customer and its subsidiaries to enable Customer to use the System(s). Customer shall take all reasonable action to fulfill its obligations with respect to the use, copying, confidentiality, and security of the System(s) and all other confidential material of [GEAC].

8. MISCELLANEOUS. All copyright, trade secret, and other proprietary rights pertaining to the System(s) and all copies thereof are vested in [GEAC] .... If either party materially breaches any of its obligations hereunder and fails to remedy such breach within thirty (30) days of written notice, the other party may, in addition to any other remedies it may have, terminate this Agreement and the License Agreement as it pertains to the System(s).

(*Id.*, Ex. B).

Under the terms of the Agreement, Defendant receives an annual maintenance fee of $120,000. Plaintiff has already paid, and Defendant has already accepted, the maintenance fee for the year 2000.

### 2. Plaintiff's Outsourcing

On August 17, 1999, Plaintiff entered into an "Information Technology Outsourcing Agreement" with Compuware Corporation, under which Compuware assumed responsibility for managing all of Plaintiff's information technology services, including the computer inventory system licensed from Defendant. Compuware, in turn, subcontracted with CareTech Solutions, Inc., to manage Plaintiff's services. According to Plaintiff, "[i]n lieu of hiring new employees to manage DMC's information systems, CareTech hired **existing** DMC employees who were already performing the management and administrative functions of DMC's information services." (Pl.'s Br.Supp.Prelim.Inj. at 5).

As part of the outsourcing agreement, "[Plaintiff] and CareTech entered into a confidentiality agreement, not only for the benefit of [Defendant], but also for the benefit of similar vendors providing computer information to [Plaintiff]." (Pl.'s Br.Supp.Prelim.Inj. at 6).

### 3. Defendant's Reaction to the Outsourcing

According to Defendant, Plaintiff's outsourcing to CareTech allows CareTech "to have complete access to and use of the [Defendant's] System," which could not be granted without Defendant's consent and was done "in direct violation of its agreements with [Defendant]." (Def.'s Br. Opp'n at 6). At oral argument, counsel for Defendant also contended that Plaintiff had materially breached the Agreement by assigning all payment and performance obligations relating to its existing information technology services, including Defendant's System, to Compuware/CareTech, and by granting Compuware/CareTech a power of attorney to exercise custody and control over Plaintiff's information technology equipment, including Defendant's System. Defendant contends that by doing so, Plaintiff has in effect assigned its rights under the Agreement to Compuware/CareTech in violation of paragraph 4 of the Agreement.

By a letter dated March 15, 2000, Defendant offered its consent to the outsourcing arrangement *"provided* [Plaintiff] and CareTech executed [Defendant's] standard Processor Non-disclosure Agreement and paid the applicable access fee (i.e.$294,-553.00)." [3] (*Id.*). According to Defendant, Plaintiff refused this offer and filed suit in Wayne County Circuit Court instead. (*Id.*).

Plaintiff contends that "[t]o assure [Defendant] that confidentiality remained intact, [Plaintiff] and CareTech offered to enter into another agreement, solely for the benefit of [Defendant] that would allay

---

**3.** In its March 15, 2000 letter, Defendant actually offered its consent at a reduced processor access fee of $150,000.00. In re-sponse, Plaintiff contends that *"[t]here is no provision in the Agreement for such additional access fees."* (Pl.'s Br.Supp.Prelim.Inj. at 6).

[Defendant's] confidentiality concerns regarding the outsourcing arrangement." (Pl.'s Br.Supp.Prelim.Inj. at 6). "[Defendant], however, refused to accept [Plaintiff's] offer, ignored [Plaintiff's] remedial efforts to cure the alleged breach and wrongfully continued to demand outrageous additional access fees." (*Id.*).

On March 23, 2000, "[Plaintiff] learned for the first time, when it attempted to resolve an existing software support problem that could only be addressed by [Defendant's] support personnel, that [Defendant] had indeed carried out its threat by ceasing its maintenance and technical support." (*Id.* at 7). Thereafter, on March 24, 2000, Plaintiff filed suit in Wayne County Circuit Court seeking a declaratory judgment (1) that Plaintiff did not commit a material breach of the Agreement by entering into the outsourcing agreement with CareTech, or, in the alternative, that its proposed remedy cured any alleged breach; (2) that Defendant's termination of the Agreement, maintenance, or technical support would constitute a material breach by Defendant; and (3) that Defendant is obligated to comply with the terms of the Agreement.

This matter is now before the Court on Plaintiff's motion for a preliminary injunction.

## Discussion

▇ Like all equitable remedies, a preliminary injunction will not issue unless the right to relief is clear. *See Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18,* 471 F.2d 872, 876 (6th Cir.1972). This Court must consider four factors in deciding whether to issue a preliminary injunction:

1. plaintiff's likelihood of success on the merits;

2. whether an injunction will prevent irreparable injury;

3. whether an injunction will harm others;

4. whether the public interest would be served by the issuance of an injunction.

*Moltan Co. v. Eagle–Picher Indus., Inc.,* 55 F.3d 1171, 1175 (6th Cir.1995). None of these four factors is a prerequisite to the issuance of a preliminary injunction; rather, the Court must balance the four factors in deciding the propriety of a preliminary injunction. *Performance Unlimited v. Questar Publishers, Inc.,* 52 F.3d 1373, 1381 (6th Cir.1995).

### 1. Likelihood of Success on the Merits

The degree to which a plaintiff must establish a likelihood of success on the merits often depends upon the strength of the other three factors. *See In re DeLorean Motor Co.,* 755 F.2d 1223 (6th Cir. 1985); *Cincinatti Sub–Zero Prod. v. Augustine Med.,* 800 F.Supp. 1549, 1557 (S.D.Ohio 1992) (citing *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 538 (6th Cir.1978)). Plaintiff contends that it is likely to succeed on the merits of its declaratory judgment action for several reasons.

First, Plaintiff argues that its outsourcing arrangement with CareTech did not grant access to a "third party" because CareTech is Plaintiff's authorized agent and the employees utilizing the System under the outsourcing arrangement are the same employees that were utilizing the System prior to the outsourcing. (Pl.'s Br.Supp.Prelim.Inj. at 8–9). Under the Agreement, however, Plaintiff was granted permission to make the System available only to "employees of [Plaintiff] and all [Plaintiff's] subsidiaries." (*Id.,* Ex. A at ¶ 7). It is clear that CareTech is not an *employee* of Plaintiff, nor is CareTech a *subsidiary* of Plaintiff. That Plaintiff may have granted CareTech the authority to act as its agent with respect to its information technology services does not change this fact.

Plaintiff also contends that, in the event there was a breach of the Agreement, such a breach was not material. According to Plaintiff, "[its] outsourcing agreement with CareTech does not alter the performance under any of the essential provisions of the

... Agreement. [Plaintiff] has continued its service under the Maintenance Agreement and has not in any way altered its performance obligations under the Agreement." (*Id.* at 9).

Defendant asserts that the confidentiality provisions in the Agreement "are not only material, they are an essential element when dealing with proprietary items such as th[ose] involved in this case." (Def.'s Br. Opp'n at 9). According to Defendant, "[it] goes to great lengths to preserve the confidentiality of the System by, among other things, securing confidentiality agreements from licensees." (*Id.* at 4). Therefore, although Plaintiff's outsourcing to CareTech may not have significantly altered the performance expected of Defendant under the Agreement, it may still constitute a material breach in that CareTech now has access to information Defendant deems confidential under the Agreement.

Plaintiff contends that any material breach was timely cured in conformance with paragraph 7 of the Agreement when Plaintiff and CareTech offered to execute a blanket confidentiality agreement with respect to the System and therefore, Defendant's subsequent termination of services was "clearly a violation of the Agreement." (Pl.'s Br.Supp.Prelim.Inj. at 9). It appears to the Court that Plaintiff's proposed cure was not satisfactory to Defendant because it did not provide for the payment of an additional access fee in the amount of $294,553.00. Plaintiff, on the other hand, maintains that there is no provision in the Agreement requiring additional access fees. It is clear, however, that the Agreement only grants Plaintiff and its employees and subsidiaries permission to use the System. Therefore, although the Agreement may not contain a provision for additional access fees, the Court cannot say, based upon the evidence currently before it, that Defendant had no right to demand such, or that Plaintiff's willingness to se-

cure additional confidentiality agreements from CareTech constituted a timely cure.

██  In general, the Court is not convinced that Plaintiff has established a strong likelihood of success on the merits. This fact by itself, however, is not fatal to Plaintiff's motion for a preliminary injunction, as the Court is satisfied that other factors do weigh significantly in favor of granting a preliminary injunction in this case.

### 2. Irreparable Injury

A plaintiff "must always demonstrate some irreparable injury before a preliminary injunction may issue." *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 104 (6th Cir.1982). An injury "is not irreparable if it is fully compensable by money damages" *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir. 1992). An injury, however, "is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Id.*

Plaintiff contends that it will suffer irreparable harm because without the System and Defendant's continued maintenance and technical support, it will not be able to provide proper health care for its patients. (Pl.'s Br.Supp.Prelim.Inj. at 10). According to Plaintiff, "[i]nterruptions in computer support services could result in vendors receiving untimely payments and vendors subsequently withholding medical products and services." (*Id.* at 4–5). Plaintiff further contends that at some of its facilities, including some critical and urgent care facilities, the one day's worth of supplies typically stocked under the "stockless" inventory system can be depleted in as little as twelve hours. (*Id.* at 10). Plaintiff contends that Defendant's refusal to maintain and support the System will not only adversely affect its operations, "but it will also adversely affect patient care and the public's interest in receiving adequate medical care."[4] (*Id.*).

**4.** The Court notes that "whether the public    interest will be served by the issuance of an

The Court is satisfied that this prong weighs in favor of granting Plaintiff's request for a preliminary injunction. Without a proper functioning computer inventory system, Plaintiff runs the risk of not having adequate medical supplies and, as a corollary, not being able to render sufficient medical services. Under these circumstances, the potential for irreparable harm exists not only as to Plaintiff, but the public in general.

### 3. Potential Harm to Others

Defendant, on the other hand, contends that it will suffer irreparable harm in the event that an injunction were to issue because its confidential computer software system has been disclosed to a competitor, namely Compuware. (Def.'s Br. Opp'n at 9). The Court notes, however, that Compuware and CareTech have had access to Defendant's system since August of 1999. Therefore, this case does not raise the same considerations as those cases in which a Plaintiff is trying to enjoin the initial disclosure of proprietary information.[5]

Furthermore, Defendant was willing to grant CareTech access to the System provided it executed Defendant's standard confidentiality agreement and pay an additional access fee. Therefore, the Court is convinced that any potential harm that Defendant may suffer as a result of a preliminary injunction may be mitigated by placing appropriate conditions upon the grant of a preliminary injunction.

### 4. Public Interest

Defendant contends that this prong weighs in favor of denying Plaintiff's motion for a preliminary injunction because the public has an interest in the performance of contracts. The Court, however, finds Defendant's argument misplaced with regard to the case *sub judice*. Plaintiff does not wish to terminate its performance under the Agreement. In fact, it is Defendant who seemingly wishes to terminate its performance under the Agreement.

To the extent that Defendant argues that the public has an interest in the performance of confidentiality agreements, the Court agrees. However, the Court believes that the public's interest in receiving adequate medical care outweighs its general interest in the performance of such agreements, especially in cases such as this, where the beneficiary of the confidentiality provision is willing to authorize disclosure given the right conditions. Therefore, the Court is satisfied that this prong weighs in favor of granting Plaintiff's request for a preliminary injunction.

### 5. Security

In the event that the Court determines injunctive relief to be proper, Defendant requests that the Court require Plaintiff to post a bond in the amount of $294,553.00, the additional access fee requested by Defendant. Federal Rule of Civil Procedure 65(c) provides that:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sums as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Although the wording of Rule 65(c) appears on its face to be mandatory, "the rule in [the Sixth Circuit] has long been

---

injunction" is typically the fourth factor considered when determining whether an injunction should issue. In this case, however, this factor is intimately connected with Plaintiff's ability to render services.

5. The Court, however, does not agree with Plaintiff's contention that because the System

is already ten years old it "could provide little if any sensitive information that would be relevant when one considers the existence of updated, more sophisticated software programs that exist today." (Pl.'s Br.Supp.Prelim.Inj. at 11).

that the district court possesses discretion over whether to require the posting of security." *Moltan Co.,* 55 F.3d at 1176 (citing *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 539 (6th Cir.1978); *Urbain v. Knapp Bros. Mfg. Co.,* 217 F.2d 810, 815–16 (6th Cir.1954)).

The Court does not believe that the posting of security is necessary in this case. Defendant does not contend that it will suffer any immediate financial damage as a result of a preliminary injunction in this action. Instead, Defendant merely argues that:

> In this case, [Defendant] is within its rights under the terms of the parties' agreement to cease providing maintenance to [Plaintiff] and to terminate the parties' agreement entirely. However, [Defendant] has indicated a willingness to consent to the arrangement proposed by [Plaintiff] in the event that appropriate arrangements are structured concerning the confidentiality (i.e. its standard Processor Non-disclosure Agreement is executed) and [Plaintiff] pays the applicable fee (i.e. Two Hundred Ninety Four Thousand Five Hundred Fifty Three ($294,553.00) Dollars).

(Def.'s Br. Opp'n at 10). It is clear that the amount Defendant requests as security does not reflect "costs and damages" that may be incurred as a result of the preliminary injunction, but rather, the amount Defendant has determined is a reasonable additional access fee.

The only harm that Defendant has identified as a potential consequence of a preliminary injunction is disclosure of its proprietary materials to Compuware/CareTech, which Defendant contends is one of its direct competitors. (Def.'s Br. Opp'n at 9). Because the Court is sensitive to the harm such disclosure could cause to Defendant, and because Plaintiff has already expressed a willingness to enter into additional confidentiality agreements, the Court is convinced that conditioning the grant of a preliminary injunction upon execution of Defendant's standard "Processor Non–Disclosure Agreement" would provide Defendant with sufficient protection. Therefore, as a condition of the preliminary injunction, Plaintiff shall be required to obtain executed "Processor Non–Disclosure Agreements" from the appropriate personnel at CareTech.

### Conclusion

For the reasons stated above, Plaintiff's request for a preliminary injunction shall be granted upon the condition that Plaintiff obtain executed "Processor Non–Disclosure Agreements" from the appropriate personnel at CareTech.

Plaintiff shall submit, for entry by the Court, an Order granting the preliminary injunction.